**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

INSOMNIAC HOLDINGS, LLC, a Delaware
limited liability company,

     Plaintiff,

vs.                                                              CASE NO.:  1:25cv23486

SDC HOLDINGS, LLC, a Florida limited liability
company; DAVID E. SINOPOLI, an individual;
HI-NOTE PRODUCTION & CONSULTING
LLC, a Florida limited liability company;
DAVIDE L. DANESE, an individual; FULL
CIRCLE F&B LLC, a Florida limited liability
company; JOSE G. COLOMA CANO, an
individual; and THE HAPPY COMPANY LLC, a
Florida limited liability company,

     Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Insomniac Holdings, LLC ("Insomniac" or "Plaintiff"), by and through undersigned counsel of record, hereby sues Defendants SDC Holdings, LLC ("SDC"), David Sinopoli ("Sinopoli"), HI-Note Production & Consulting LLC ("HINote"), Davide L. Danese ("Danese"), Full Circle F&B LLC ("Full Circle"), Jose Gabriel Coloma Cano ("Coloma"), and The Happy Company LLC ("THC") (SDC, Sinopoli, HI-Note, Danese, Full Circle, Coloma, and THC, collectively, the "CDD Parties" and each a "CDD Party," and, from time-to-time, "Defendants"), and for its Complaint alleges as follows:

### INTRODUCTION

1.     This is a case of greed.  Of biting the hand that feeds.  And ultimately, a case of deceit.

1

2.     Prior to 2019, three local club promoters, Messrs. Sinopoli, Danese, and Caloma (collectively individually, "CDD"), were running Club Space, formerly one of Miami's most historic and beloved music venues.  CDD were operating on a whim without so much as an ownership interest in the very name and brand that the business relied upon for its success.  Even the most basic business functions, like ensuring a long-term lease, were absent or neglected.

3.     Put simply, CDD needed help.

4.     In 2019, Insomniac—the most successful, safety conscious, and recognized names in the dance music industry—threw its support, resources, and vision behind CDD by purchasing 51% of Club Space.  The strategy behind the renaissance of Club Space so that it could return to, and far exceed, the heyday it once enjoyed prior to CDD's operation, began with Insomniac laying the foundation by negotiating a long-term lease with Club Space's landlord to ensure future security, and securing an ownership interest in the intellectual property behind Club Space.  This security paved the way for investment in the long-term success of Club Space, bringing never before seen success to the venue.

5.     Insomniac ensured that Club Space actually had the contractual right to use the name "Club Space" and, over the past six years, septupled Club Space's revenue, with 2025 reaching record highs.

6.     A rising tide lifts all ships, and between distributions and management fees, payments to Messrs. Sinopoli, Danese, and Coloma increased nearly **tenfold**—adding an extra "0" to each of their annual paychecks, taking home in excess of $8 million **each** through partnering with Insomniac.

7.     Initially grateful, CDD expressed their appreciation toward Insomniac, at one point saying, "*we made our first million with you.*"

8.      In fact, the success of CDD working together with Insomniac was so great that the Parties decided to try their hand at another venue: Factory Town, with Insomniac providing all of the funding.

9.      After proving the concept, the Parties negotiated operating agreements, management agreements, and the like (collectively, the "Factory Town Agreements") with Insomniac also committing to fund over $40 million in lease payments, facility expenses, and capital improvements from its own coffers in support of the venture between the Parties.  The CDD Parties happily signed on the dotted line and sent the executed documents off to Insomniac for countersignature.

10.      Sadly, however, as is too often the case, CDD's taste of success ultimately betrayed them.   CDD wanted more guaranteed money, more control, and—counterintuitively—*no* accountability, risk, or exposure.

11.      While Insomniac was obtaining the necessary approvals from its publicly traded parent company—a process that is all but quick—something changed.  It appears that CDD saw an opportunity to work with Club Space's landlord and cut Insomniac out.  The landlord owned Club Space prior to CDD, and prior to Insomniac's purchase of an interest in the "Club Space" name and IP, owned and controlled 100% of the "Club Space" name.

12.      While Insomniac was getting approval to countersign the Factory Town Agreements, the CDD Parties rescinded their signatures and began making outrageous demands for millions of dollars to be paid to the CDD Parties, in addition to increased ownership percentages—all while having made no capital contributions and without any financial risk whatsoever, all of which was to be borne by Insomniac.  In fact, monies derived from events at Factory Town were held hostage in a bank account controlled by Mr. Sinopoli, despite the fact that

Insomniac had paid all expenses in connection with the events. The CDD Parties' scheme was starting to reveal itself.

13.     Tellingly, the CDD Parties did not raise any credible misconduct or violations of contract, common law, or statute as the basis for their demands; instead, CDD threatened to file a lawsuit containing a thirty-page smear campaign against Insomniac's CEO and founder—Pasquale Rotella ("Mr. Rotella")—along with a pre-planned press campaign to go with it.

14.     When informed of the frivolity of their position and reminded of the arbitration agreements that would govern their claims against Mr. Rotella, the CDD Parties said the quiet part out loud regarding their true intentions for filing an action instead of an arbitration.  To paraphrase, they said: *that's fine, you'll move to compel arbitration, but it will already be out there, so I think you're missing the point.*

15.     But in an attempt to work collaboratively and avoid costly litigation for both Parties, Insomniac suggested the Parties pursue mediation to resolve their disagreements.  This resulted in the Parties attending a sixteen-hour mediation with one of the best mediators/private judges in the entire country: the Honorable Judge Michael A. Hanzman (ret.) ("Judge Hanzman").

16.     And, to preserve their continued partnership in Club Space and ensure a peaceful and profitable transition of Factory Town to being operated only by Insomniac, the Parties settled their dispute, leaving mediation with a binding term sheet (the "Term Sheet"), and ultimately executing a settlement agreement further delegating jurisdiction to Judge Hanzman for certain disputes (the "Settlement Agreement").

17.     In a nutshell, the Settlement Agreement provided that the Parties would work together to produce the two currently scheduled events at Factory Town: Hocus Pocus and Art Basel.  The CDD Parties would receive a payment for the compromise and be released from their

obligations at Factory Town and serious misconduct relating thereto.  Insomniac would solely assume ownership, control, management, and operations of Factory Town, with the CDD Parties transferring, assigning, or relinquishing all right, title, interest, and/or ownership in any property, services, intellectual property, materials, marketing, etc. relating to Factory Town or any event held at Factory Town.

18.     Yet, even before the Settlement Agreement was executed and in no hurry to do so, the CDD Parties helped themselves by taking nearly three million dollars from the 1306 Lounge, LLC bank account without notifying Insomniac or Judge Hanzman, knowing there was a pending hearing on several outstanding issues: a sign of what was to come.  The moment the proverbial[1] ink dried on the Settlement Agreement; it was déjà vu all over again.  The CDD Parties decided they did not like the deal they agreed to.  As a result, the CDD Parties intentionally misrepresented the terms of the Settlement Agreement by morphing them into something that did not remotely resemble the paper on which it was written. The CDD Parties began demanding Insomniac take on more expenses than was required under the Settlement Agreement and assume millions of dollars of event expenses on its own, while falsely conveying to the EDM industry that the CDD Parties had "won their lawsuit against Insomniac," and misrepresenting they had complete control over the Hocus Pocus and Art Basel events, all in violation of their confidentiality and non-disparagement obligations.

19.     But this time, the agreement that the CDD Parties sought to skirt was fully executed, with Judge Hanzman appointed by the Parties to adjudicate certain issues.  Thus, to remedy the CDD Parties' repeated violations of the Settlement Agreement and stifle the CDD Parties' incessant attempts to rewrite the terms of the Settlement Agreement, Insomniac moved for an order

---

[1] The Settlement Agreement is electronically signed.

from Judge Hanzman enforcing certain terms of the Settlement Agreement.  Judge Hanzman set, and the Parties attended, a hearing on Insomniac's motion, which resulted in an Order from Judge Hanzman agreeing with Insomniac on every salient point raised in Insomniac's motion.

20.     Prior to the hearing, however, the CDD Parties had already shown their true intentions and made clear that if they lost, they simply would not perform their obligations under the Settlement Agreement with respect to Hocus Pocus and Art Basel.

21.     Sure enough, immediately after the CDD Parties being informed that they had, in fact, lost, and Judge Hanzman confirming that they were bound by the deal they signed, the CDD Parties had an outburst and told Judge Hanzman he had no jurisdiction over the issues while stating (and confirming, in writing) that they would not be complying with the Settlement Agreement and would initiate litigation against Insomniac.

22.     That same day, the Club Space landlord (who appears to be the CDD Parties' new billionaire partner they have been touting throughout the dispute), with whom the CDD Parties had been conspiring for months, sent a demand letter to Insomniac claiming a breach of certain agreements.[2]  Fortunately, the letter serves only to bolster Insomniac's claims and confirms its suspicions.

23.     What has become evidently clear is that CDD's intentions throughout the dispute were never to find a resolution.  Instead, CDD has been working to bully Insomniac and push it out of the Parties' partnership.  Despite numerous attempts to provoke Insomniac over the past year, Insomniac has made every attempt to bend and compromise in order to preserve and continue the Parties' relationship.  Having failed to provoke Insomniac, the CDD Parties have now resorted

---

[2] As the Court will see, Insomniac simply did not breach the agreements—not even close.

to threatening litigation on the back of baseless claims, leaving Insomniac with no choice but to seek recourse through this action.

24.     While Insomniac fully expects a retaliatory lawsuit from the CDD Parties, it will amount to nothing more than an elaborate and unfounded smear campaign against Mr. Rotella, as the CDD Parties have continuously threatened to do.

25.     This is not a case of how David stood against Goliath.  Rather, it is a case about how no good deed goes unpunished.  Insomniac invested in and elevated the enterprise of three relatively unknown event promoters, and, after making millions of dollars, those three promoters simply got too big for their britches.

26.     Even worse, the CDD Parties ensured that they had taken their payment to fund the forthcoming litigation between the Parties before the Settlement Agreement was even signed.

### PARTIES, JURISDICTION, AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest, costs, and reasonable attorneys' fees.

28.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  Further, under 28 U.S.C. § 1391(b)(1), all Defendants reside in the Southern District of Florida.

29.     Plaintiff Insomniac is a Delaware limited liability company, whose members are: (i) Pasquale Rotella, a citizen of the State of California; (ii) Live Nation Worldwide, Inc., a Delaware corporation with its principal place of business in California; (iii) Owl Holding, Inc., a Nevada corporation with its principal place of business in California; and (iv) Owl Entertainment,

Inc., a Delaware corporation with its principal place of business in California.  Thus, Plaintiff is a citizen of Delaware, Nevada, and California.

30.     Defendant SDC is a Florida limited liability company, whose members are David E. Sinopoli, a citizen of the State of Florida, Davide L. Danese, a citizen of the State of Florida, Jose G. Coloma Cano, a citizen of the State of Florida.  As a result, SDC is a Florida citizen for purposes of diversity of citizenship.

31.     Defendant HINote is a Florida limited liability company, whose sole member is David E. Sinopoli, a citizen of the State of Florida.  Hence, HiNote is a Florida citizen for purposes of diversity of citizenship.

32.     Defendant Full Circle is a Florida limited liability company, whose sole member is Davide L. Danese, a citizen of the State of Florida.  Thus, Full Circle is a Florida citizen for purposes of diversity of citizenship.

33.     Defendant THC is a Florida limited liability company, whose sole member is Jose G. Coloma Cano, a citizen of the State of Florida.  Resultingly, THC is a Florida citizen for purposes of diversity of citizenship.

34.     Defendant David E. Sinopoli is an individual domiciled in the State of Florida.

35.     Defendant Davide L. Danese is an individual domiciled in the State of Florida.

36.     Defendant Jose G. Coloma Cano is an individual domiciled in the State of Florida.

37.     Because Defendants are all citizens of the State of Florida as they are domiciled therein, this Court can exercise general personal jurisdiction over all Defendants, as all Defendants are "at home" in this forum.

38.     Complete diversity exists between the Parties.

<u>BACKGROUND AND FACTS</u>

**I.      INSOMNIAC HOLDINGS, LLC**

39.      Insomniac is the largest dance music production company in the world.  Founded in 1993, Insomniac has, under the leadership of its CEO, Mr. Rotella, carefully curated an unparalleled reputation for excellence and safety in the dance music industry over the last three decades.  Insomniac has successfully planned and executed thousands of events with tens of millions of attendees across five continents, ranging from dance music festival cruises to its flagship production: Electric Daisy Carnival Las Vegas, the largest festival in the Americas, if not the world, with nearly 600,000 attendees and more than 250 artists spread out over sixteen stages, three nights, and 1,200 acres.  Time and time again, Insomniac has produced events that resulted in spectacles rivaled by none, whilst prioritizing the safety of its attendees, which Insomniac affectionately refers to as its "headliners":



---

[3] This picture depicts the main stage of EDC Las Vegas, known as "Kinetic Field," during the 2025 edition of the festival.





---

[4] Unlike other festivals of similar attendance, Insomniac has, for decades, provided free-of-charge hydration stations manned by its employees at various locations throughout its venues. This picture depicts these hydration stations. Such hydrations stations filter water through state-of-the-art systems, including UV sterilization, and are marked by water droplet symbols on festival maps provided to its "headliners" free of charge.

[5] In another staple of Insomniac festivals, this picture depicts "ground control" employees that Insomniac employs at its various festivals. These "ground control" employees are dedicated to helping attendees stay happy, healthy, and hydrated. Donning purple shirts and waving lightsabers, the ground control crew make their way through the crowds to ensure that any attendee that needs assistance—whether it be in finding the nearest hydration station or medical tent, or for any reason whatsoever—can find someone to assist them and point them in the right direction.

40.     It is because of this reputation of productional, organizational, and logistical excellence that CDD sought to partner with Insomniac in 2019.  At the time, CDD were a group of promoters who were cruising in mediocracy while attempting to run a legendary piece of Miami music history, Club Space.

## II.     INSOMNIAC PURCHASES 51% OF SPACE INVADERS & AN INTEREST IN THE CLUB SPACE IP

41.     In 2019, Insomniac purchased 51% of Space Invaders, LLC ("Space Invaders"), the company that operated downtown Miami's famed "Club Space."

42.     As noted above, Space Invaders was then majority owned by CDD.  Club Space was stagnant.  Though CDD were operating "Club Space," they did not have any ownership in the "Club Space" brand.  Space Invaders had a short-term lease (less than three years) and were clearly unable to achieve Club Space's full potential.

43.     Following the 2019 acquisition, Space Invaders is now owned 51% by Insomniac, with Messrs. Sinopoli, Danese, and Coloma, each owning approximately 10.62%, and each having a management agreement providing for additional compensation in exchange for services.

44.     However, and as will become more relevant below, the CDD management agreements expressly prohibited CDD from engaging in any accounting or finance functions or otherwise binding Space Invaders.  There are several other members of Space Invaders that are not involved in this dispute.

45.     Now, CDD's role is limited to front of the house management, social media, marketing, curation, and promotion.  Even there, CDD reports to the Board of Space Invaders, which is majority held by Insomniac.

46.     For example, CDD maintains the passwords and control of the Club Space social media presence, website, Dice ticketing account, and other public-facing promotional tools.

47.     As part of the acquisition, Insomniac also obtained a license for Space Invaders to actually use the name Club Space, as well as its affiliated social media accounts and website.

48.     Since the acquisition, Insomniac, through its guidance, strategic partnership, and resources, has increased Club Space's annual revenue by over **700%** in just six years, and is on pace to reach new highs in 2025.

### III.     INSOMNIAC & CDD START PROMOTING EVENTS AT FACTORY TOWN

49.     Because of the success of Club Space, in 2021, Insomniac and CDD started hosting events at another venue.  Specifically, the Parties began putting on events together at a venue known as "Factory Town," located at 4800 NW 37th Ave, Miami, Florida 33142 (the "Factory Town Venue").  The Parties used the space subject to a rental fee, paid on an event-by-event basis. The fee would vary depending on the length of the event (usually a few days) and demand, but overall, it was very expensive to produce events at the Factory Town Venue due to the lack of existing infrastructure. And, of course, the cost was born by Insomniac alone—CDD was compensated despite taking no risk.

50.     At the time, the Factory Town Venue was nothing more than some empty lots and buildings from an old mattress factory.  Again, Insomniac would pay 100% of the costs associated with creating a suitable venue for events.

51.     Venue costs aside, there were also a slew of other fees paid to third-party vendors in connection with producing the events, such as talent, staging, and catering.  And, for each event, Insomniac was required to pay for the designing, building, and then dismantling entire stages, booths, and other structures commensurate with a large music event.  Insomniac, and Insomniac alone, committed to fund and provide 100% of the capital required to cover these fees and costs. Insomniac would contract with third-party vendors to design, build, and deconstruct the stages and

booths, as well as ticketing service providers, sponsors, and otherwise undertake all backend operational tasks and expenses.   These efforts were undertaken to ensure that events were profitable and that the Factory Town Venue would be sustainable.

52.    CDD would participate in promotion and management and, despite zero capital contribution or financial obligation to vendors or the landlord, would make a hefty fee.   There was no contract outlining or requiring payments to CDD, but instead, the structure would be discussed per event.

53.    However, for some events, while the agreed-upon management fee was intended to be a percent-based fee based on profit, CDD would demand their management fee off the gross revenue—regardless of whether the event was profitable.

54.    After a brief trial run of events, it quickly became clear that the arrangement was not profitable or sustainable due to the cost of the pay-per-event rental, including the rental cost, the cost to build and deconstruct stages and booths, and CDD's hefty management fee—especially if CDD was going to continue to receive gross revenue-based management fees without respect to profitability.

55.    So, Insomniac informed CDD that absent a solution or change of circumstances, the arrangement was no longer feasible.

56.    To manage the high cost associated with periodic rentals and with competing promoters approaching the landlord of the Factory Town Venue, the Parties agreed in early 2023 that it was necessary to enter into a long-term lease to secure the exclusivity of the Factory Town Venue and protect the Parties' position in the market.   Recognizing the strategic need for this, the Parties negotiated a putative arrangement under which Insomniac would shoulder the burden of an expensive long-term lease, guaranteed by its publicly traded parent, as well as commit to make

more than $15 million in capital improvements.  In exchange, the Parties would create a joint entity
and CDD would take a slightly lesser percentage of net fees rather than gross proceeds—*i.e.*, based
on profitability instead of just revenue.  The benefit, of course, was that CDD now had yet another
venue in partnership with one of the largest entertainment companies in the world, without
expending or risking a single dollar.  The arrangement was projected to generate millions of dollars
for CDD with zero risk.

57.     What CDD failed to disclose was that on approximately September 13th, 2021,
CDD took a position in the real estate of the Factory Town Venue and stood to profit from the
lease.  Had Insomniac known that CDD was negotiating on both sides of the deal, Insomniac would
have taken a materially different approach to the Factory Town lease and partner negotiations,
considering CDD's backend profits.

58.     CDD then proceeded to lead Insomniac to believe that CDD was helping Insomniac
to negotiate favorable terms, while surreptitiously hiding the fact that CDD was doing everything
that they could to increase value for themselves as an owner of the Factory Town Venue.

59.     On August 1, 2023, Insomniac executed a ten-year primary lease for the Factory
Town Venue with two additional consecutive ten-year options, committing Insomniac to more
than $22 million in rent obligations in the initial term alone.

60.     Suddenly, and without warning, on or around May 17, 2024, the CDD Parties
rescinded the agreements signed in January 2024 and again began demanding that Insomniac pay
CDD millions more than previously agreed.  And, perfectly illustrating that their intent all along
was to improperly compete, they also started demanding to be released from certain non-
competition restrictions relating to Club Space.

61.     Of course, had Insomniac known that CDD never intended to enter into long-term agreements or partnership for the Factory Town Venue, Insomniac would have taken a very different approach.

62.     And, despite their outrageous demands, the CDD Parties recognized their very real liability for a $40-million-dollar fraud claim.

### IV.     THE PARTIES SETTLE; THE CDD PARTIES' BREACH THE SETTLEMENT AGREEMENT

63.     So, on June 2, 2025, Insomniac and the CDD Parties attended a sixteen-hour mediation with Judge Hanzman.  The Parties settled and left mediation with a binding Term Sheet of basic material terms and a time-limited agreement to execute the full Settlement Agreement, reserving jurisdiction to Judge Hanzman if the Parties could not finalize the Settlement Agreement. A true and correct copy of the Term Sheet is attached hereto as **Exhibit A**.

64.     While delaying execution of the Settlement Agreement, the CDD Parties took the payment provided to them thereunder without the Settlement Agreement even being executed. Indeed, the Parties had to submit to hearing before Judge Hanzman to arbitrate the terms of the Settlement Agreement, as the CDD Parties insisted on terms that were not agreed to in the Term Sheet—a pattern if there ever was one.

65.     After the hearing before Judge Hanzman on outstanding issues, on July 2, 2025, the CDD Parties executed the Settlement Agreement, and the Parties had a binding Settlement Agreement settling all disputes related to Factory Town (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit B**.

66.     The Settlement Agreement also provided that the Parties would work together to produce the two currently scheduled events at Factory Town: Hocus Pocus and Art Basel.  Club Space, through the CDD Parties, would co-promote the event with Insomniac.  Club Space would

rent Factory Town from its now sole owner, Insomniac, and Club Space would receive 100% of the ticket revenue, and 20% of the net revenue from the bar.

67.    The CDD Parties would receive a payment and be released from their obligations at Factory Town and their significant misconduct relating thereto.  Insomniac would take over ownership, control, management, and operations of Factory Town, with the CDD Parties transferring, assigning, or relinquishing all right, title, interest, or ownership in any property, services, intellectual property, materials, marketing, etc. relating to Factory Town or any event held at Factory Town.

68.    However, since the Parties entered into the Term Sheet and Settlement Agreement, it has become clear that the CDD Parties not only will not comply with the Settlement Agreement, but are instead working to compete with or otherwise destroy Factory Town and Club Space, sharing confidential information with Club Space's landlord—the owner of the real property where Club Space operates—and third parties, and otherwise acting in bad faith and in breach of their contractual obligations.

      a.    <u>The CDD Parties Immediately Breach the Confidentiality, Industry Talking Point, and Non-Disparagement Provisions in the Settlement Agreement.</u>

69.    After the mediation, the CDD Parties immediately began violating the confidentiality, industry talking point, and non-disparagement provisions in the Settlement Agreement.

70.    Section 14 requires that the terms of the Settlement Agreement remain strictly confidential, with extremely limited exceptions.  Ex. B § 14.

71.    And, Section 15(b) provides that any communications with others in the music industry be limited to agreed-upon talking points, namely:

     i.     Insomniac is assuming full responsibility for Factory Town management and operations.

    ii.    The Parties are on good terms and will maintain their successful partnership while continuing to produce events together.

   iii.   Club Space will continue to curate events at Factory Town.

Ex. B § 15(b).

72.     Specifically, Section 15(a) of the Settlement Agreement unequivocally prohibits the CDD Parties from, directly or indirectly, making any statement that, if publicized, "would cause or tend to cast [Insomniac] in a negative light, or cause the recipient of the communication to question the business condition, integrity, competence, good character, or product quality" of Insomniac.  Ex. B § 15(a).

73.     Starting with their trip to Ibiza in early July 2025, mere days after the execution of the Settlement Agreement, the CDD Parties met with a reputable promoter, and told him that they "won their lawsuit against Insomniac," throwing their confidentiality and non-disparagement obligations to the wind.

74.     While the Parties' Settlement Agreement resulted in the CDD Parties forfeiting their entire interest in Factory Town, the CDD Parties misrepresented to this and other individuals that the CDD Parties gained exclusive control over Factory Town and its operations—a falsehood if there ever were one.

75.     The CDD Parties directed this individual and others not to talk to Insomniac about Factory Town events.

76.     Yes, that is correct.  After the Term Sheet and Settlement Agreement confirmed that the CDD Parties had no ownership in Factory Town, the CDD Parties represented to others

that they were in control and instructed others not to talk to the sole owner of Factory Town—Insomniac.

77.     Not only does this violate the Confidentiality and Non-Disparagement provisions of the Settlement Agreement, but the Settlement Agreement specifically dictates the industry talking points under which the Parties must abide.

78.     The CDD Parties ignored the industry talking points, telling anyone who would listen that the CDD Parties had defeated Insomniac and were now in charge of Factory Town, from talent booking to management.

79.     But the misdeeds do not stop there.  The CDD Parties were consistently keeping Club Space's landlord and others in the industry apprised of the dispute, the Settlement Agreement, and the terms thereof, confidentiality provision be damned.

80.     The CDD Parties' disregard for the confidentiality provisions was so blatant that the CDD Parties actually admitted to informing Antonio Carbonaro—the CEO and founder of a popular music act with which the Parties were trying to contract for the Art Basel event—of the Parties' dispute and the Settlement Agreement so that he would come testify at a hearing before Judge Hanzman, to whom the Parties delegated binding authority over certain matter *for the purpose of maintaining confidentiality.*

81.     And, what's more, the CDD Parties shared confidential Factory Town information located on a Google Drive, including sensitive information regarding the budget, talent grid, marketing plan, ticket scaling, and email lists for Hocus Pocus and Art Basel, with an individual named Justin Levine, who just happens to be the manager of the ownership group that owns Club Space's corporate landlord:



  b. <u>The CDD Parties Refused to Transfer the Required Assets and Intellectual Property.</u>

 82. As noted above, one of the material terms of the Settlement Agreement is the transfer of certain intellectual property, and non-tangible assets. Indeed, nearly three pages of the Settlement Agreement is dedicated to this provision, which states, inter alia*:*

4. Work for Hire. The Parties agree as follows:

(a) All results and proceeds of any kind or nature from any services rendered by SDC ("SDC Services"), jointly or severally, for, on behalf of, or in connection with, the FT Parties, including without limitation all forms of all documents, designs, inventions, and other patentable, trademarkable, copyrightable, or otherwise protectable material conceived, created, delivered or reduced to practice, in whole or in part, by SDC or rejected or exploratory materials in any stage of development, created by SDC for Factory Town or the Factory Town Venture ("Deliverables") was, shall become, and/or shall remain, as applicable, the exclusive property of Insomniac.

(b) To the extent possible, any Intellectual Property Rights in any Services rendered by SDC, Deliverables, and any other materials generated by SDC for Factory Town which are copyrightable will be deemed "works made for hire" for the FT Parties under the U.S. Copyright Act and other similar laws of the applicable international jurisdiction(s) of the world. To the extent that they are not "works made for hire," SDC hereby irrevocably assign all Intellectual Property Rights in any such

Services, Deliverables and any other materials generated by SDC in perpetuity and agree to waive or refrain from exercising any residual moral or equitable remuneration rights. SDC hereby assigns all other Intellectual Property Rights in the Services, Deliverables and any other materials generated by SDC for Factory Town or the Factory Town Venture in connection with, the FT Parties, Factory Town, the Factory Town Venture, **or any event held at Factory Town**. To the extent any Intellectual Property Rights in Services, Deliverables and any other materials generated SDC on behalf of, or in connection with, the FT Parties, Factory Town, the Factory Town Venture, or any event held at Factory Town, are not assignable or waivable, SDC jointly and severally, hereby grant Insomniac an exclusive, worldwide, irrevocable, perpetual, royalty-free, freely transferable license to reproduce, distribute, create derivative works of, publicly perform, publicly display and transmit by any means or format, whether now known or hereafter devised, such Intellectual Property Rights in Services, Deliverables and any other materials generated SDC for, on behalf of, or in connection with, the FT Parties, Factory Town, the Factory Town Venture, **or any event held at Factory Town.**

(c) "Intellectual Property Rights" means, collectively, all copyrights, trademark rights, inventions, moral rights, neighboring rights, patent and design rights, proceed rights, proprietary rights, re-use rights, rental and lending rights, equitable remuneration rights, and related rights, now and hereafter recognized, throughout the universe, in perpetuity without any restrictions of any type, including, without limitation, so-called "creative right" restrictions, permissions, and/or re-use fees or other payments, together with any goodwill attaching thereto. Without limiting the generality of the foregoing, ownership of all right, title and interest in the Services, Deliverables and any other materials generated by SDC for Factory Town or the Factory Town Venture for, on behalf of, or otherwise in connection with the FT Parties, Factory Town, the Factory Town Venture, or any event held at Factory Town and any part thereof, including, without limitation, all Intellectual Property Rights therein or related thereto, will automatically and immediately fully vest in Insomniac (even if not completed) upon the moment of creation without the necessity of any further action or consideration by any Party.

Ex. B § 4(a)–(c).

83.    Importantly too, other than SDC, the remaining CDD Parties represented and warranted that they did not have any information or assets, and did not render any services for or to Factory Town or the Factory Town Venture, to wit:

(d) Other than SDC, the remaining CDD Parties represent and warrant that they did not provide any proceeds, services, deliverables, or products of any kind, including without limitation documents, designs, inventions, and other patentable, trademarkable, copyrightable, or otherwise protectable material conceived, created,

20

delivered or reduced to practice, to or for Factory Town or the Factory Town Venture. Put differently, the remaining CDD Parties have no information or rights to transfer or relinquish pursuant to sections 4(a)-(c), or section 5 below.

Ex. B § 4(d).

84.     In other words, only SDC put on events or provided services to Factory Town and the Factory Town Venture.   Indeed, only SDC was a party to the rescinded Factory Town Agreements.   In sum, all assets and information relating to Factory Town, the Factory Town Venture, or any event held at Factory Town are Insomniac's.

85.     The Settlement Agreement goes on:

Assignment and Assumption of Assets.

(a) SDC hereby assigns, and Insomniac hereby agrees to assume, all assets or other property used or developed in connection with, arising from, or otherwise related to Factory Town or the Factory Town Venture that SDC had, have, or may in the future obtain, including, but not limited to, (i) all website, application, social media, or other digital accounts, logins, passwords, or other access rights to any online website, platform, or similar asset, (ii) tangible, intangible, or personal property, (iii) intellectual property, (iv) data, (v) website or email domains, (vi) internal or external databases, and (vii) artwork, marketing materials, or other digital or physical assets such as footage, photographs, logos, or similar materials. SDC hereby agrees that, from and after the Effective Date, SDC shall at the reasonable request of Insomniac, Live Nation, or the FT Parties, execute, acknowledge, and deliver such additional documents, instruments, or conveyances, and take such further actions, as may be reasonably necessary or desirable to effectuate, perfect, confirm, or evidence the complete transfer, assignment, and relinquishment of all right, title, and interest in and to the foregoing assets or property, whether real, personal, tangible, or intangible, including but not limited to executing deeds, assignments, releases, or other instruments of transfer. SDC further agrees to reasonably cooperate fully in providing any information, records, or consents required to facilitate the assignment or transfer of such assets or property interests the designated assignee(s), and to perform all acts reasonably required to ensure that Live Nation, Insomniac, or the FT Parties, as the case may be, obtain the full benefit of any such assignment, and shall comply with a request to do so within seven (7) days of a request by Insomniac or the FT Parties.

Ex. B § 5(a).

86.     Immediately upon execution of the Term Sheet, and then again upon execution of the Settlement Agreement, Insomniac requested the transfer of information.

87.     In keeping with their conduct, the CDD Parties initially refused to cooperate, seven days came and went.

88.     But eventually, after countless requests from Insomniac, most of the intellectual property and assets relating to Factory Town were transferred by SDC to Insomniac.

89.     That is, until Insomniac followed up on the information, they had requested related to a Factory Town Event known as "Hocus Pocus."  Then, the CDD Parties simply outright refused.

90.     Not only is Hocus Pocus an event that has been held at Factory Town, but also in its five years of existence Hocus Pocus is an event that has **only ever been held at Factory Town.**

91.     Insomniac explained this to the CDD Parties and again requested transfer of the information required under the Settlement Agreement.  Insomniac also pointed out that Hocus Pocus is expressly referred to as a "Factory Town Event" in the Settlement Agreement and therefore covered by its terms.

92.     Moreover, all of the other information relating to Hocus Pocus—aside from the login information that would actually allow Insomniac to market, promote, and sell tickets to the event—is in the "Factory Town Master" Google Drive.

93.     In other words, there is little doubt that Hocus Pocus is a Factory Town event.

94.     Still, the CDD Parties refused, and Mr. Sinopoli confirmed yet another breach of the Settlement Agreement: During a phone call on July 28, 2025, Mr. Sinopoli said, "Hocus Pocus is proprietary to us," meaning, not to Insomniac nor Club Space and their partnership with

Insomniac, but to the CDD Parties themselves, and the CDD Parties confirmed their intent to do the event at other venues.

95.     This can only mean one of two things: (1) SDC simply failed to convey assets it was required to convey or (2) the remaining CDD Parties breached their representation and warranty.

96.     Finally, with the continued disparagement and misconduct, Insomniac had enough, and on July 18, 2025, Insomniac sent the CDD Parties a Demand to Cease and Desist and Notice of Default.  A true and correct copy of the Demand to Cease and Desist and Notice of Default is attached hereto as **Exhibit C**.

97.     Still, the CDD Parties failed to comply with their obligations.

c.      The CDD Parties Launch Hocus Pocus Marketing & Ticket Sales Without Insomniac's Approval.

98.     Unhappy with the Settlement Agreement that they agreed to, the CDD Parties tried to renegotiate the financial obligations of the partnership, Space Invaders, under the Settlement Agreement, and instead tried to pin certain non-permanent expenses to Insomniac, the new Factory Town landlord under the terms of the Settlement Agreement.

99.     The Settlement Agreement states:

Hocus Pocus shall be co-promoted by Insomniac and Club Space/Space Invaders, LLC. **SDC shall ensure that Insomniac approves all budgets, ticket pricing, etc. prior to announcing the event or details thereof**.

Ex. B § 6(a)(i) (emphasis added).

100.    Along those lines, on July 21, 2025, Insomniac, through counsel sent an email expressly notifying the CDD Parties that an announcement and artwork was not approved. Specifically, Insomniac's counsel sent the following email:

As you may or may not know, the CDD Parties have still not obtained the proper approvals for Hocus Pocus and Art Basel. In fact, they have still never requested approval for anything.

Along those lines, we just learned that the CDD Parties have built out an event on Club Space's DICE ticketing account, with an announce date of July 22, 2025, and an on-sale date of July 24, 2025. See the first image below. This is not approved and the CDD Parties have zero authority to do this.

As a threshold matter, the Factory Town DICE ticketing account is the exclusive ticketing account for the venue. No other account can be used. In addition, the cost per ticket on the Factory Town DICE account is cheaper.

In addition, the artwork for the event says "Club Space Presents." Per the settlement agreement, this is an event that will be promoted to the public both by Space and Insomniac. As such, Insomniac needs to be included in the artwork and marketing materials in equal size and prominence as Club Space. This is similarly unapproved. See the second image below.

Please ensure that your clients immediately stop any scheduled announcements or ticket sales until they receive express approval.

A true and correct copy of this email between counsel is attached hereto as **Exhibit D**.

101.    The CDD Parties, through counsel, erroneously responded that the event had been

approved for some time. To which Insomniac responded and reiterated:

Please confirm your client will not be announcing the event. It is, as of now, not approved.

Talk to you tomorrow.
JS

A true and correct copy of these emails between counsel is attached hereto as **Composite**

**Exhibit E**.

102.    And again:

As I noted in my first email.  Your client is not approved to announce or sell tickets on the Space Invaders Dice account or otherwise.

Please confirm your clients will not be proceeding.  I'm trying to avoid looping in Judge Hanzman here but that's the next step.

*Id*.

103.   And again:

No.

What I am saying is we have an Agreement requiring your client to obtain certain approvals, which they have not gotten.

I am saying that the artwork your clients uploaded to the Space Dice account included only Space—which you acknowledged was error.

I am saying that the exclusive Dice account for Factory Town events is the Factory Town Dice so we cannot use the Space one.

I am also saying that the Factory Town Dice account is cheaper per ticket, meaning the cost per sale is less, which will yield more money—not less—so its the better option anyway.

As for the remainder of your assertion, let's not forget who chose to do Factory Town with us without the other members. While Insomniac has express permission to do so under the Operating Agreements, your clients do not.

Last, and as your client unknowingly conceded, Space is paying market rent to Factory Town in light of what it is receiving included within the rent.

Please ensure that the Dice account does not announce or start selling tickets, until we approve.

*Id*.

104.   However, a few hours later, the CDD Parties announced the event.

105.   They announced it without Insomniac's approval and after being notified that they were expressly prohibited from doing so and using the artwork that was expressly disapproved.  It is important to again note that Insomniac is Space Invader's controlling member and controls its board.

106.   Moreover, Insomniac's logo was entirely buried in the promotional materials.  It was not in equal size and prominence, and it gave no indication of a co-promotion as required.

107.    In addition, and again against the express instruction of Insomniac, the CDD Parties used the Club Space Dice ticketing platform, not the Factory Town platform, to launch and sell tickets for the event, despite Hocus Pocus being, unequivocally and exclusively, a Factory Town event.  As noted in more detail below, the event has never taken place anywhere else.

108.    The CDD parties used unapproved logos, engaged in improper self-promotion and competition, and otherwise launched the event not only without approval, but over Insomniac's express objection.

109.    Moreover, the CDD Parties, through counsel, expressly agreed to use the Factory Town Dice Account:

> If Insomniac has now decided they no longer want to use the Club Space Dice account, that's totally fine.

*Id*.

110.    This is critical because under the terms of the Settlement Agreement, Insomniac has control over all budgets and ticket pricing, as well as full operational and managerial control. Many of these functions are impacted, modified, and/or selected, in whole or in part, through Dice.

111.    This conduct is a blatant breach of the Parties' fully executed, legally binding Settlement Agreement.

112.    But, over the express objection and instruction of Insomniac, they launched Hocus Pocus anyway.  Yet again, the CDD Parties signed an agreement, changed their minds, and decided not to adhere to it.

113.    The problem for the CDD Parties is that this time, the agreement was fully executed.

114.    Perhaps most importantly and most harmful, the CDD Parties did not obtain Insomniac's approval on ticket pricing as required by the Settlement Agreement.

115.    Importantly too, the CDD Parties' management agreements with Space Invaders expressly prohibit CDD from making any accounting or finance decisions without Insomniac's approval.

116.    That is because, as noted above, the CDD Parties, when left to operate a business, consistently cause harm.

117.    But to the CDD Parties the words on the page don't matter, nor do the signatures at the bottom; the CDD Parties simply do what they want without regard or what was agreed to.

118.    And, true to form, the CDD Parties botched the launch.  The ticket prices chosen by the CDD Parties (not approved by Insomniac) were insufficient to cover the costs of the event that are customarily covered by ticket revenue.

> d.    The CDD Parties Violated the Budget Approval Provisions in the Settlement Agreement.

119.    Like they did with the Factory Town Agreements, immediately following the execution of the Settlement Agreement, the CDD Parties attempted to renegotiate to increase their control, line their pockets, and place additional burdens on Insomniac.

120.    Specifically, despite the unambiguous language of the Settlement Agreement, the CDD Parties claimed that Insomniac, acting as the landlord under the Settlement Agreement for the two remaining Factory Town Events, must incur the cost of all outside vendors, hourly workers, non-permanent event staff, licensing, and other costs of the event.

121.    The Settlement Agreement contains no such requirement.

122.    On the contrary, the Settlement Agreement confirms that Insomniac is *not* required to incur the costs listed above.

123.    The Settlement Agreement unambiguously states exactly what is included within the rent, and exactly what costs Insomniac is responsible for:

Space Invaders shall pay Insomniac the sum of $300,000 for the sublease, which shall include the use of the entire property and all stages, as well as all **permanent venue staff** and **existing permanent infrastructure** (including staging) at no extra cost.

Insomniac shall operate the bars at Factory Town and shall be responsible for the **cost of bar staff**.

Insomniac shall provide **permanent venue staff**.

Ex. B § 6(a)(i)–(v) (emphasis added).

124.    Put simply, while the CDD Parties argue that Insomniac is responsible for a litany of event related expenses, the Settlement Agreement (and later the Hanzman Order), unambiguously confirm that Insomniac is only responsible for paying the limited expenses listed in the Settlement Agreement.

125.    But apparently, with the CDD Parties their word is not their bond, nor is their signature.  The CDD Parties were adamant that, regardless of the language of the Settlement Agreement, CDD Parties were going to force Insomniac to pay more: more than the costs Insomniac agreed to pay with respect to the Factory Town Events and more than the seven-figure settlement that the CDD Parties improperly paid themselves.

    e.    The CDD Parties Breach the Settlement Agreement, Binding Space Invaders and Insomniac to over $1.5M in Talent Bookings Without Approval—for Events with which the CDD Parties Are Now Refusing to Cooperate.

126.    The CDD Parties are minority members of Space Invaders with no board control. The CDD Parties are contracted labor serving at the pleasure, direction, and supervision of the Space Invaders Board.  The CDD Parties have no authority to bind Space Invaders without the express consent of the Space Invaders Board, which is controlled, in all material respects, by Insomniac.  And, as to Factory Town, the CDD Parties were paid in full for whatever interest that

the CDD Parties may have had in Factory Town and now have no interest, no control, and no say so.  But they ignored those restrictions.

127.    As noted above, the CDD Parties no longer have any interest in Factory Town's success.  On the contrary, the CDD Parties are doing everything in their power to sabotage Factory Town's events.

128.    Notwithstanding that the CDD Parties had no ability to bind Space Invaders and no interest in Factory Town, the CDD Parties began making binding offers to talent for Art Basel without Insomniac's approval.

129.    The Settlement Agreement states, in no uncertain terms:

> Except to the extent contracts with talent/artist are already fully executed, SDC shall initially **propose** all talent/artists and submit **proposed offers/contracts/agreements** at market rates to Insomniac prior to execution for their review and approval, such approval not to be unreasonably withheld.

Ex. B § 6(a)(i) (emphasis added).

130.    The CDD Parties' role was very simple and very limited:  they were to make a proposal to Insomniac.  Nothing more; nothing less.  The words "book," "select," "choose," "contract," "agree," or their synonyms are conspicuously absent from the Settlement Agreement.

131.    The CDD Parties were certainly not handling the legal complexities of contracting with talent; indeed, the Space Invaders Operating Agreement and Management Agreements expressly prohibit CDD from doing so, and the Settlement Agreement confirms that Insomniac "approves all budgets."  The CDD Parties were to make a proposal, and once it was approved, Insomniac would handle the operations, contracts, and budget items per the express terms of literally every agreement between the Parties.

      f.   <u>The CDD Parties Sought an Order from Judge Hanzman; They Lost</u>.

132.    Unhappy with the terms of the Settlement Agreement that they had signed and negotiated for over a month, the CDD Parties sought relief from Judge Hanzman, who was designated in the Settlement Agreement as the final arbiter on disputes over allocation of expenses and issues related to talent booking.

133.    The CDD Parties sought to exclude Insomniac from all talent booking correspondence and obtain carte blanche artist and talent selection rights for the two remaining co-promoted Factory Town events.

134.    The CDD Parties threatened that if they did not get their way, they would unilaterally "terminate" the Settlement Agreement.

135.    The Parties set a hearing before Judge Hanzman on July 23, 2025.

136.    Prior to the hearing, on July 18, 2025, Judge Hanzman sent the Parties a cautionary email:

> [S]o there is no misunderstanding, both sides are ordered to comply with [the Settlement Agreement] in all respects until and unless I were to find a Party in material breach and relieve the other side of their obligation to perform.

A true and correct copy of this email is attached hereto as **Exhibit F**.

137.    The Parties met for an in-person hearing in the office of Bilzin Sumberg on July 23, 2025.

138.    Shockingly, the CDD Parties brought a third-party "witness" with them, whom they told about the Settlement Agreement and nature of the dispute, in clear breach of the confidentiality provision of the Settlement Agreement.

139.    Just prior to the hearing, the CDD Parties confirmed once again what they had informed Insomniac and Judge Hanzman prior, and what Judge Hanzman had cautioned against.

140.    The CDD Parties stated, in no uncertain terms, that if forced to comply with the terms of the Settlement Agreement they simply would not cooperate with Hocus Pocus and Art Basel as required.

141.    Put differently, the CDD Parties expressly stated that they would not comply with the Settlement Agreement.  Their justification?  It didn't make sense.

142.    The Parties proceeded through the hearing.  Judge Hanzman reviewed the Parties' submissions, reviewed documents, and heard argument of counsel.

143.    The CDD Parties lost.

144.    Judge Hanzman ruled that not only was there no breach by Insomniac, but also, the CDD Parties positions were wholly rejected.

145.    On July 31, 2025, Judge Hanzman issued his order addressing the Parties' concerns ("Hanzman Order").

146.    A true and correct copy of the Hanzman Order is attached hereto as **Exhibit G**.

147.    On the issue of talent booking, the Hanzman Order rejected the CDD Parties' contention, holding, *inter alia*:

> In the initial communication with any Talent and upon the transmission of any offer, the CDD Parties shall state clearly and conspicuously in writing, in the same size font as the remainder of the communication, the following language:
>
>> "Please note that any offers for booking are subject to final approval by Insomniac Holdings, LLC."

*Id*. § II ¶ 6.

148.    Judge Hanzman held that failure to include this language in communication with any talent would constitute a violation of the Settlement Agreement.  Judge Hanzman further clarified that "Insomniac has final approval rights for all Talent bookings."  *Id*. § II ¶ 7.

149.    Judge Hanzman also required the CDD Parties to complete specific tasks, stating, inter alia: "the CDD Parties shall provide to Insomniac a list of proposed Talent for Art Basel on or before July 31, 2025." *Id*. § II ¶ 3.

150.    The CDD Parties did not provide a complete list of talent by the deadline, or ever.

151.    Judge Hanzman also required that Insomniac and the CDD Parties "set aside no less than 2 hours a week to meet, over Zoom, to discuss the progress on booking of Talent for Art Basel." *Id*. § II ¶ 10.

152.    The CDD Parties did not comply and still have not complied.

153.    On the expense allocation issue, the Court found, *inter alia*:

> I do not see how the landlord, Insomniac, is remotely required to provide things like additional lighting, shuttles, clean up, DJ gear, event specific permits, meals, and other similar event-related expenses. As I noted, I find those to be Partnership expenses. I also am inclined to conclude that temporary staff and related costs such as stagehands are not landlord expenses.

*Id*. § III ¶ 6.

154.    And, noting the CDD Parties attempted to have Judge Hanzman re-write the Settlement Agreement, the Hanzman Order held:

> As noted on the record, courts don't rewrite deals and I'm certainly not rewriting this one. The Parties spent 16 hours at mediation and negotiated the Settlement Agreement for months. At this point I am not finding that the Settlement Agreement is ambiguous, and I am inclined to conclude that many of the items on the list proposed by the CDD Parties are not, under the Settlement Agreement, Landlord expenses.

*Id*. § III ¶ 10.

155.    The Hanzman Order also required that, "[b]efore August 4, 2025, the CDD Parties shall provide a full budget (including Prices and totals) of the items it wishes to impute to the landlord at which time the patties shall meet and confer." *Id*. § III ¶ 8.

156.    The Hanzman Order further set a hearing for August 13, at which time he would address and finalize any further disputes. *Id*. § III. ¶ 9.

157.    The CDD Parties have since indicated that they would no longer comply with the Settlement Agreement.

      g.    <u>The Same Day as the Hanzman Order, the CDD Parties Confirm their Commitment to Non-Performance.</u>

158.    Mere hours after the issuance of the Hanzman Order, the CDD Parties informed Insomniac and Judge Hanzman that they will not be complying with any further obligations under the Settlement Agreement or the Hanzman Order. They were taking their ball and going home:

> CDD will not be filing a motion tomorrow morning as there is no jurisdiction for the issues that need to be adjudicated, there is no need for any further hearings as my client has no further duty to perform (it cannot perform as described above and as a result of Insomniac's intentional plot to sabotage my client and Space). Certain CDD parties will be filing an action for damages, other relief and will explore other avenues to mitigate damages. These issues are all well beyond the jurisdiction of the Arbitrator.

A true and correct copy of this email is attached hereto as **Composite Exhibit H**.

159.    Of note, this was less than two weeks after Insomniac's July 18, 2025, Demand to Cease and Desist and Notice of Default. *See* Ex. C.

160.    Also of note, the CDD Parties email is devoid of any citations any provisions of the Settlement Agreement or the Hanzman Order.

161.    In response, Judge Hanzman, sent another cautionary email, this time directed only to the CDD Parties:

> Bruce, if your client has decided not to put on the events, I agree with you that there is nothing left for me to deal with, as a Court will have to adjudicate whether it was relieved from any obligations to perform (i.e. put on the events) due to a prior material breach on the part of Insomniac, or whether by failing to put on the events it breached the [Settlement Agreement]. So if you are formally advising me and opposing counsel that your client has decided that it is not participating in the two events because Insomniac has, in its view, materially breached the [Settlement

33

> Agreement], and that breach has relieved your clients of any further duty to perform, I will cancel the 8/13 hearing. Please discuss this with your client and let us know whether that is in fact the course of action they have committed to take. Regards, Michael.

Comp. Ex. H.

162.    The CDD Parties confirmed their commitment to non-performance, with their lawyer stating without ambiguity, "Yes, this is the course of action that my clients have committed to."  Comp. Ex. H.

163.    And, a few short hours later, Insomniac received a letter from an entity owned or controlled by the CDD Parties' newfound partner, Club Space's landlord, which relied on information provided to Justin Levine by the CDD Parties in violation of the Settlement Agreement and other contracts between the Parties.

164.    The next play in the CDD Parties' play book will no doubt be filing their smear campaign against Pasquale Rotella.

       h.   <u>Now, the CDD Parties Are Preventing Insomniac from Operating and Endangering the Public.</u>

165.    The CDD Parties are now not only refusing to cooperate in the promotion of Hocus Pocus and Art Basel, but also, they are actively preventing Insomniac from doing so.

166.    The CDD Parties misconduct has and will continue to cause Insomniac millions of dollars in damages and irreparable harm to its business.

167.    The CDD Parties have not only ignored their contractual obligations, both specific requirements and general cooperation and promotion responsibilities, but are also withholding critical information, which would allow Insomniac to attempt to mitigate its damages.

168.    Recall above, the CDD Parties launched the Hocus Pocus event without approval, utilizing a ticketing account to which the CDD Parties solely maintain administrative control.

169.    The CDD Parties are refusing to provide Insomniac with the requisite login information to allow Insomniac to continue selling tickets, modify prices, or otherwise transfer the information to the proper ticketing account to ensure that ticket purchasers received the benefit of their purchases.

170.    In addition, the CDD Parties' refusal to provide the requisite log in information to the Hocus Pocus Instagram, Facebook, website, and other social media is preventing Insomniac from properly promoting the event to ensure its profitability and success, both for Insomniac and Space Invaders, which stood, prior to the CDD Parties misconduct, to profit considerably from the event.

171.    The CDD Parties improperly bound Space Invaders to over $1.5 million in talent expenses without approval, launched the Hocus Pocus event and started selling tickets at incorrect prices without approval, and are now taking active steps to prevent Insomniac from once again fixing the CDD Parties' misconduct and ensuring that the event proceeds, consumers receive their tickets, and Space Invaders profits, or at least, does not suffer a loss at the hands of CDD.

172.    In light of the CDD Parties' continued breaches and efforts to sabotage Insomniac, Club Space, and the two upcoming events, this lawsuit seeks, in part, to allow Insomniac to save and protect the Club Space brand, and to mitigate the irreparable harm the CDD Parties are causing Insomniac.

173.    All conditions precedent to the filing of this action have occurred, or have otherwise been performed, satisfied, or waived.

174.    Plaintiff has engaged the law firm Shaw Lewenz and is obligated to pay the firm reasonable attorneys' fees and costs.

## COUNT ONE
## <u>BREACH OF CONTRACT</u>
(Confidentiality, Non-Disparagement, & Talking Points)
(as to the CDD Parties)

175.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

176.    Plaintiff and the Defendants entered into the Settlement Agreement.

177.    The Settlement Agreement is a valid and enforceable contract under Florida law.

178.    Plaintiff performed all its obligations under the Settlement Agreement.

179.    Defendants materially breached the Settlement Agreement by, without limitation, violating the Confidentiality, Non-Disparagement, and Talking Points provisions thereof.

180.    Specifically, Section 15(a) of the Settlement Agreement unequivocally prohibits the CDD Parties from, directly or indirectly, making any statement that, if publicized, "would cause or tend to cast [Insomniac] in a negative light, or cause the recipient of the communication to question the business condition, integrity, competence, good character, or product quality" of Insomniac.

181.    Section 14 requires that the terms of the Settlement Agreement remain strictly confidential, with extremely limited exceptions.

182.    And, Section 15(b) provides that any communications with others in the music industry be limited to agreed-upon talking points, namely:

     i.    Insomniac is assuming full responsibility for Factory Town management and operations.

     ii.    The Parties are on good terms and will maintain their successful partnership while continuing to produce events together.

     iii.    Club Space will continue to curate events at Factory Town.

183.    Defendants breached these provisions by informing individuals in the industry that they "won their lawsuit against Insomniac," and by representing that they gained exclusive control over Factory Town and its operations.

184.    Further, Defendants breached these provisions by informing Antonio Carbonaro, Justin Levine, and others of the parties' dispute, the Settlement Agreement, and its terms.

185.    Defendants' breaches of the Settlement Agreement are material and, as a result of these material breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

**COUNT TWO**
**<u>BREACH OF CONTRACT</u>**
(Failure to Transfer Property & Information)
(as to SDC)

186.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

187.    Plaintiff and the Defendants entered into the Settlement Agreement.

188.    The Settlement Agreement is a valid and enforceable contract under Florida law.

189.    Plaintiff performed all its obligations under the Settlement Agreement.

190.    The Settlement Agreement requires SDC to transfer certain intellectual property, assets, and information to Plaintiff.  *See* Ex. B § 4(a)-(c) and § 5(a).

191.    SDC materially breached the Settlement Agreement by, without limitation, refusing to provide the intellectual property, assets, and information to Insomniac as required under the terms of the Settlement Agreement.

192.    Defendants' breaches of the Settlement Agreement are material and, as a result of these material breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

**COUNT THREE**
**PERMANENT INJUNCTIVE RELIEF**
(Requiring the Transfer and Discontinued Use of Property and IP)
(as to the CDD Parties)

193.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

194.    Under sections 4 and 5 of the Settlement Agreement, SDC is required to transfer certain assets, property and information to Plaintiff, including, for example and without limitation, marketing materials, website domains and social media account logins and passwords. *See* Ex. B § 4(a)-(c) and § 5(a).

195.    The remaining CDD Parties represented and warranted that they did not have any the assets, property and information required to be transferred to Plaintiff under sections 4 and 5

of the Settlement Agreement and did not render any services for or to Factory Town or the Factory Town Venture.  *Id*. § 4(d).

196.    SDC has refused to provide Plaintiff the assets, property and information required to be transferred under sections 4 and 5 of the Settlement Agreement.  And, the CDD Parties have made it clear that they believe all such assets, property and information relating to Hocus Pocus are proprietary to the CDD Parties, meaning, not to Insomniac or Club Space and their partnership with Insomniac, but to the CDD Parties themselves, and the CDD Parties confirmed their intent to produce the Hocus Pocus event at other venues, in violation of the Settlement Agreement.

197.    Because Defendants breached the Settlement Agreement, Plaintiff will likely succeed on the merits of its claims.

198.    Without the transfer of the assets, property and information under sections 4 and 5 of the Settlement Agreement, Plaintiff will suffer irreparable harm.  Indeed, Hocus Pocus and Art Basel will come and go without Plaintiff being able to adequately produce these events, potentially leaving thousands of ticket holders without an event to attend and Plaintiff's reputation with Miami's dance music industry irreparably harmed.

199.    The balance of the hardship weighs heavily in favor of Plaintiff, as Defendants already contracted, and were paid, for the assets, property and information under sections 4 and 5 of the Settlement Agreement.  Conversely, as stated above, Plaintiff will suffer unquantifiable reputational damage without the assets, property and information under sections 4 and 5 of the Settlement Agreement.

200.    Plaintiff has no adequate remedy at law.  Indeed, without the assets, property and information under sections 4 and 5 of the Settlement Agreement, Hocus Pocus and Art Basel will

come and go without Plaintiff being able to adequately produce them, and Plaintiff's reputation with Miami's music industry will suffer unquantifiable damage.

201.    The public interest will be served by the Court entering a mandatory injunction requiring Defendants to transfer the assets, property and information under sections 4 and 5 of the Settlement Agreement, by showing the public that courts enforce contractual rights, and by permitting Plaintiff to put on Art Basel and Hocus Pocus, the latter for which members of the public have already begun purchasing tickets.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for mandatory and prohibitive injunctive relief:

(a) Enforcing the terms of the Settlement Agreement;

(b) Enjoining Defendants from utilizing the assets, property and information under sections 4 and 5 of the Settlement Agreement, relinquished, or disclaimed in sections 4 and 5 of the Settlement Agreement, including without limitation, those related to Hocus Pocus;

(c) Mandating the conveyance of the assets, property and information under sections 4 and 5 of the Settlement Agreement, including without limitation, those related to Hocus Pocus, to Plaintiff; and

(d) Issuing any further relief the Court deems just and proper under the circumstances.

## COUNT FOUR
## TEMPORARY INJUNCTIVE RELIEF
(Requiring the Transfer of Information to allow for the Promotion of Hocus Pocus)
(as to the CDD Parties)

202.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

203.    Under sections 4 and 5 of the Settlement Agreement, SDC is required to transfer certain assets, property and information to Plaintiff, including, for example and without limitation, marketing materials, website domains and social media account logins and passwords.  *See* Ex. B § 4(a)-(c) and § 5(a).

204.    The remaining CDD Parties represented and warranted that they did not have any the assets, property and information required to be transferred to Plaintiff under sections 4 and 5 of the Settlement Agreement and did not render any services for or to Factory Town or the Factory Town Venture.  *Id*. § 4(d).

205.    SDC has refused to provide Plaintiff the assets, property and information required to be transferred under sections 4 and 5 of the Settlement Agreement.  And, the CDD Parties have made it clear that they believe all such assets, property and information relating to Hocus Pocus are proprietary to the CDD Parties, meaning, not to Insomniac or Club Space and their partnership with Insomniac, but to the CDD Parties themselves, and the CDD Parties confirmed their intent to produce the Hocus Pocus event at other venues, in violation of the Settlement Agreement.

206.    Because Defendants breached the Settlement Agreement, Plaintiff will likely succeed on the merits of its claims.

207.    Without the transfer of the assets, property and information under sections 4 and 5 of the Settlement Agreement, Plaintiff will suffer irreparable harm.  Indeed, Hocus Pocus and Art Basel will come and go without Plaintiff being able to adequately produce these events, potentially

leaving thousands of ticket holders without an event to attend and Plaintiff's reputation with Miami's dance music industry irreparably harmed.

208.     The balance of the hardship weighs heavily in favor of Plaintiff, as Defendants already contracted, and were paid, for the assets, property and information under sections 4 and 5 of the Settlement Agreement.  Conversely, as stated above, Plaintiff will suffer unquantifiable reputational damage without the assets, property and information under sections 4 and 5 of the Settlement Agreement.

209.     Plaintiff has no adequate remedy at law.  Indeed, without the assets, property and information under sections 4 and 5 of the Settlement Agreement, Hocus Pocus and Art Basel will come and go without Plaintiff being able to adequately produce them, and Plaintiff's reputation with Miami's music industry will suffer unquantifiable damage.

210.     The public interest will be served by the Court entering a mandatory injunction requiring Defendants to transfer the assets, property and information under sections 4 and 5 of the Settlement Agreement, by showing the public that courts enforce contractual rights, and by permitting Plaintiff to put on Art Basel and Hocus Pocus, the latter for which members of the public have already begun purchasing tickets.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for an order during the pendency of this action in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for mandatory and prohibitive injunctive relief:

(a) Enforcing the terms of the Settlement Agreement;

(b) Enjoining Defendants from utilizing the assets, property and information under sections 4 and 5 of the Settlement Agreement, relinquished, or disclaimed in

sections 4 and 5 of the Settlement Agreement, including without limitation, those related to Hocus Pocus;

(c) Mandating the conveyance of the assets, property and information under sections 4 and 5 of the Settlement Agreement, including without limitation, those related to Hocus Pocus, to Plaintiff; and

(d) Issuing any further relief the Court deems just and proper under the circumstances.

**COUNT FIVE**
**<u>SPECIFIC PERFORMANCE</u>**
(Requiring the Transfer of Property and IP)
(as to SDC)

211.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

212.    SDC is required to transfer certain assets, property and information under sections 4 and 5 of the Settlement Agreement to Plaintiff.  *See* Ex. B § 4(a)-(c) and § 5(a).

213.    The terms of the Settlement Agreement are clear and definite.

214.    The Settlement Agreement contains both a mutuality of obligation and remedy.  In other words, all Parties are required to perform thereunder, and all Parties can seek recourse in the event of a breach.

215.    SDC has refused to provide the assets, property and information under sections 4 and 5 of the Settlement Agreement to Insomniac as required under the terms of the Settlement Agreement.

216.    Because Defendants entered into and breached the Settlement Agreement, Plaintiff is clearly entitled to the assets, property and information under sections 4 and 5 of the Settlement Agreement.

217.    Plaintiff has no adequate remedy at law.  Indeed, Hocus Pocus and Art Basel will come and go without Plaintiff being able to adequately produce these events, potentially leaving thousands of ticket holders without an event to attend and Plaintiff's reputation with Miami's dance music industry irreparably harmed.

218.    Without the transfer of the assets, property and information under sections 4 and 5 of the Settlement Agreement, Plaintiff will suffer irreparable harm.

219.    Justice requires specific performance of the Settlement Agreement and the transfer of the intellectual property to Plaintiff, as Defendants already contracted, and were paid, for the intellectual property.  Plaintiff will suffer unquantifiable reputational damage without the intellectual property it purchased from Defendants.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a decree of specific performance in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, requiring Defendants to transfer the intellectual property purchased by Plaintiff, and issuing any further relief the Court deems just and proper under the circumstances.

**COUNT SIX**
**BREACH OF CONTRACT**
(Representation & Warranty)
(as to the CDD Parties other than SDC)

220.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

221.    Plaintiff and the Defendants entered into the Settlement Agreement.

222.    The Settlement Agreement is a valid and enforceable contract under Florida law.

223.    Plaintiff performed all its obligations under the Settlement Agreement.

224.    The remaining CDD Parties represented and warranted that they did not have any the assets, property and information required to be transferred to Plaintiff under sections 4 and 5 of the Settlement Agreement and did not render any services for or to Factory Town or the Factory Town Venture.  *Id.* § 4(d).

225.    Contrary to the representations and warranties in the Settlement Agreement, the remaining CDD Parties have made it clear that they believe all the assets, property and information required to be transferred to Plaintiff under sections 4 and 5 of the Settlement Agreement relating to Hocus Pocus is proprietary to the CDD Parties, and the CDD Parties confirmed their intent to do the event at other venues.

226.    This constitutes a material breach of the Settlement Agreement.

227.    As a result of the breach, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

**COUNT SEVEN**
**BREACH OF CONTRACT**
(Budget and Ticket Pricing Approval)
(as to the CDD Parties)

228.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

229.    Plaintiff and the Defendants entered into the Settlement Agreement.

230.    The Settlement Agreement is a valid and enforceable contract under Florida law.

231.    Plaintiff performed all its obligations under the Settlement Agreement.

232.    The Settlement Agreement states that "Hocus Pocus shall be co-promoted by Insomniac and Club Space/Space Invaders, LLC. **SDC shall ensure that Insomniac approves all budgets, ticket pricing, etc. prior to announcing the event or details thereof**."  Ex. B § 6(a)(i) (emphasis added).

233.    Defendants, however, contrary to Plaintiff's express instructions, announced Hocus Pocus without Plaintiff approving the budget or the ticket pricing.

234.    Moreover, Defendants made offers to talent for Hocus Pocus and Art Basel, binding Space Invaders to over $1.5 million in talent fees for Hocus Pocus and hundreds of thousands more for Art Basel without budget approval or compliance with the Settlement Agreement and incorporated documents.

235.    Theis constitutes material breaches of the Settlement Agreement.

236.    As a result of the breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

## COUNT EIGHT
## <u>BREACH OF CONTRACT</u>
Hocus Pocus & Art Basel Commitment to Non-Performance
(as to the CDD Parties)

237.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

238.    Plaintiff and the Defendants entered into the Settlement Agreement.

239.    The Settlement Agreement is a valid and enforceable contract under Florida law.

240.    Plaintiff performed all its obligations under the Settlement Agreement.

241.    The Settlement Agreement states that "[t]he Insomniac Parties and the CDD Parties shall collaborate on [Hocus Pocus and Art Basel], which shall be held at Factory Town. . . ." Ex. B § 6.

242.    The Settlement Agreement further states that "Hocus Pocus shall be co-promoted by Insomniac and Club Space/Space Invaders, LLC."  Ex. B § 6(a)(i).

243.    Similarly, the Settlement Agreement also states that "Art Basel shall be co-promoted by Insomniac and Club Space/Space Invaders, LLC with Insomniac taking the lead on operations."  *Id*. § 6(b)(v).

244.    Defendants, however, have breached/anticipatorily repudiated the Settlement Agreement by making it clear that they have no intention of moving forward with co-promoting Hocus Pocus and Art Basel with Plaintiff.

245.    Indeed, Defendants not only had an obligation in the Settlement Agreement to cooperate with the co-promotion of the event, but were also ordered by Judge Hanzman to provide a list of proposed talent, a proposed budget, to explicitly notate that in any offers to talent that such offers are subject to Insomniac's final approval, and to have weekly meetings with Insomniac to work together to discuss the booking of talent for Hocus Pocus and Art Basel.  *See* Ex G.

246.    Defendants have failed entirely to comply with the Settlement Agreement and the Hanzman Order, perfectly demonstrating their intent not to collaborate with Plaintiff on Hocus Pocus and Art Basel.

247.    In addition, Defendants are also actively preventing Space Invaders from complying with the leasing obligations in the Settlement Agreement.

248.    This constitutes a material breach of the Settlement Agreement.

249.    Plaintiff was ready, willing, and able to perform under the Settlement Agreement and collaborate on and co-promote Hocus Pocus and Art Basel with Defendants.

250.    As a result of Defendants' breach and anticipatory repudiation, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

### COUNT NINE
### BREACH OF CONTRACT
(Hanzman Order)
(as to the CDD Parties)

251.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in paragraphs 1 through 174 above as if fully set forth herein.

252.    Plaintiff and the Defendants entered into the Settlement Agreement.

253.    The Settlement Agreement is a valid and enforceable contract under Florida law.

254.    Plaintiff performed all its obligations under the Settlement Agreement.

255.    The Settlement Agreement delegates jurisdiction to Judge Hanzman for resolution of certain disputes.

256.    Specifically, pursuant to Section 6(a)(i) of the Settlement Agreement, Judge Hanzman has jurisdiction to hear and adjudicate disputes relating to talent offers; and

257.    Pursuant to Section 6(c)(iii) of the Settlement Agreement, Judge Hanzman has jurisdiction to hear disputes relating to allocation of certain budget items between the landlord, Insomniac and Space Invaders, LLC.

258.    On July 31, 2025, Judge Hanzman issued the Hanzman Order, which is binding on the Parties.

259.    Pursuant to the Settlement Agreement, Defendants are bound to comply with the Hanzman Order.

260.    As detailed above, Defendants failed and, in fact, refused to comply with the Hanzman Order by, without limitation, failing to produce the required information, attend required meetings, failing to include the required language in offers to talent, and failing to otherwise cooperate with the spirit and letter of the Hanzman Order and the Settlement Agreement.

261.    Defendants' breach of the Hanzman Order constitutes a material breach of the Settlement Agreement.

262.    As a result of Defendants' breach and anticipatory repudiation, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, enforcing the Hanzman Order, and for damages, including disgorgement or

return of the Settlement Payment and special damages and lost profits as a result of Defendants'

breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court

costs, along with any further relief the Court deems just and proper under the circumstances.

**COUNT TEN**
**BREACH OF CONTRACT**
(Covenant Not to Sue)
(as to the CDD Parties)

263.    Plaintiff reaffirms, realleges, and reincorporates by reference the allegations in

paragraphs 1 through 174 above as if fully set forth herein.

264.    Plaintiff and the Defendants entered into the Settlement Agreement.

265.    The Settlement Agreement is a valid and enforceable contract under Florida law.

266.    Plaintiff performed all its obligations under the Settlement Agreement.

267.    Within the Settlement Agreement the CDD Parties covenanted as follows:

 Covenant Not to Sue. The CDD Parties, in their derivative capacity as owners of
Space Invaders, LLC and related entities (derivative capacity) expressly covenant
and agree not to file or encourage any lawsuit, claim, action, or other legal charge
against Space Invaders, LLC, Space IP Licensing, LLC, Space Holdings, LLC,
Club Space Management, LLC, Insomniac, or the Insomniac Parties as defined in
the Space Invaders Operating Agreement or their respective officers, directors,
employees, owners, parents, subsidiaries, or affiliates arising out of or relating to
Insomniac's purchase of the Intellectual Property used in the operation of the Venue
as such terms are defined in the Space Invaders Operating Agreement.  Ex. B § 10.

268.    The CDD Parties breached this covenant by encouraging a claim, action, or other

legal charge by the Club Space landlord relating to the Club Space IP.

269.    The breach of this covenant constitutes a material breach of the Settlement

Agreement.

270.    As a result of Defendants' breach, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, hereby prays for a judgment in its

favor and against Defendants, SDC Holdings, LLC, David Sinopoli, HI-Note Production and

Consulting, LLC, Full Circle F&B, LLC, The Happy Company, LLC, Jose Gabriel Coloma Cano, and David Danese, for damages, including disgorgement or return of the Settlement Payment and special damages and lost profits as a result of Defendants' breach of the Settlement Agreement, pre- and post-judgment interest, attorneys' fees and court costs, along with any further relief the Court deems just and proper under the circumstances.

Dated: August 4, 2025                  Respectfully submitted,

                                       **SHAW LEWENZ**
                                       110 SE 6th Street, Suite 2900
                                       Fort Lauderdale, FL 33301
                                       Tele: (954) 361-3633
                                       Fax:  (954) 989-7781

                                       */s/ Jordan A. Shaw*
                                       Jordan A. Shaw, Esq. (FBN 111771)
                                       jshaw@shawlewenz.com
                                       Zachary D. Ludens, Esq. (FBN 111620)
                                       zludens@shawlewenz.com
                                       Gabriel E. Morales, Esq. (FBN 1038778)
                                       gmorales@shawlewenz.com
                                       Lauren N. Palen, Esq. (FBN 1038877)
                                       lpalen@shawlewenz.com