**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

INSOMNIAC HOLDINGS, LLC,

      Plaintiff,

vs.

SDC HOLDINGS, LLC, *et al.*,                        CASE NO.: 1:25cv23486-RKA

      Defendants.
_____/

SDC HOLDINGS, LLC, *et al.*

      Counter-Plaintiffs,

v.

INSOMNIAC HOLDINGS, LLC, *et al.*,

      Counter-Defendants.

_____/

**INSOMNIAC HOLDINGS, LLC AND PASQUALE**
**ROTELLA'S MOTION TO DISMISS OR STRIKE DEFENDANTS'**
**COUNTERCLAIM AND TO STRIKE IMPERTINENT ALLEGATIONS**

Counter-Defendants, Insomniac Holdings, LLC ("Insomniac") and Pasquale Rotella ("Mr. Rotella") (collectively, "Counter-Defendants"), by and through the undersigned counsel of record, and, pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby move for an order (1) dismissing the Counterclaim (Dkt. 34) filed by Counter-Plaintiffs SDC Holdings, LLC, David E. Sinopoli, Davide L. Danese, Jose G. Coloma Cano, Hi-Note Production and Consulting, LLC, Full Circle F&B, LLC, and The Happy Company, LLC (collectively, "Counter-Plaintiffs"), (2) striking the Counterclaim in its entirety as being untethered from a pleading, and/or (3) striking paragraphs 39–52, 77, 83, 88, 188, and 196 pursuant to Federal Rule of Civil Procedure 12(f)  and sections 44.405 and 44.406, Florida Statutes.  In support thereof, Counter-Defendants state the following.

## <u>INTRODUCTION & BACKGROUND</u>

A subsidiary of Live Nation, Insomniac is the largest dance-music entertainment and event company in the world, and Mr. Rotella is its CEO.  Counter-Plaintiffs are local club promoters who previously owned a majority of Miami's famed Club Space, more formally Space Invaders, LLC ("Space Invaders").  In 2019, Counter-Plaintiffs sought and received from Insomniac an investment in Club Space, whereby Insomniac acquired a 51% interest in Space Invaders.

After Space Invaders saw incredible growth, the Parties began hosting events at an abandoned mattress factory turned event venue known as Factory Town.  These collaborative events included live music events such as the "Hocus Pocus" Halloween event and a week-long series of events held during Miami's famed Art Basel.  Seeing opportunity, the Parties sought to memorialize agreements to govern this new "Factory Town Venture," which included Insomniac's financial guarantee of substantial lease obligations and tens of millions in capital improvements. Agreements were negotiated at arm's length and terms were agreed to.  Counter-Plaintiffs executed the various agreed upon operating agreements and management contracts and sent them to Insomniac for execution. Insomniac then sought the necessary approvals from its publicly traded parent company, Live Nation.  Suddenly, however, Counter-Plaintiffs rescinded their signatures and demanded more money, more control, and less accountability.

When Insomniac refused to renegotiate, Counter-Plaintiffs started making threats of a smear campaign and 30-page lawsuit containing a parade of horribles designed to tarnish Insomniac's reputation and, more so, the reputation of its CEO, Mr. Rotella, to the public.  If there were any doubt as to the truth of this allegation, one need only look at the Counterclaim and its various citations to ever reliable social media posts, and Counter-Plaintiffs' current request to depose Insomniac's entire c-suite and Live Nation's entire Board of Directors.   However, when Counter-Plaintiffs went low, Insomniac took the high road, and the Parties agreed on a pre-suit mediation in an attempt to resolve the matter.

On June 2, 2025, following a 16-hour mediation with one of the most highly regarded third-party neutrals in the country, former Miami-Dade Complex Business Division Judge, Michael A. Hanzman ("Judge Hanzman"), the Parties signed a Confidential Binding Term Sheet ("BTS"). The BTS provided for the subsequent execution of a more fulsome settlement agreement.  Before the execution of that later contemplated settlement agreement, Counter-Plaintiffs accessed a bank account (the "1306 Account") where certain monies from the Parties' joint venture were held and

paid themselves $2.9 million (the "Settlement Payment"). Counter-Plaintiffs did this despite the fact that the BTS, which was the only binding agreement at that time, required that all monies in that account were to be paid to Insomniac.

Notwithstanding Counter-Plaintiffs unilaterally paying themselves the Settlement Payment, Insomniac proceeded with the remaining terms of the BTS, and, on July 2, 2025, the Parties ultimately entered a final, fulsome, settlement agreement (the "Settlement Agreement"). The Settlement Agreement required the adjudication of certain disputes by Judge Hanzman. As a precursor to their refusal to perform and, in turn, the instant Counterclaim, Counter-Plaintiffs brought certain issues before Judge Hanzman. Specifically, Counter-Plaintiffs (1) believed they had final say on talent booking, and (2) wanted Insomniac to pay for items not contemplated by the Settlement Agreement. In other words, they wanted more money and control, attempting to rewrite the deal after taking the Settlement Payment.

As seen in the order referenced in Counter-Plaintiffs' Counterclaim and attached to the Complaint as Exhibit G (the "Hanzman Order"), Judge Hanzman rejected Counter-Plaintiffs' arguments. And, as seen by the screenshots in the Counterclaim, less than 24 hours later, Counter-Plaintiffs notified Insomniac and Judge Hanzman that they would no longer be performing their obligations under the Settlement Agreement. Insomniac's suit followed.

Counter-Plaintiffs have now filed what can only be described as a defensive counterclaim. The Counterclaim—which is not attached to a pleading as required by the Federal Rules of Civil Procedure and Eleventh Circuit precedent—is a 44-page ad hominem attack on Insomniac's CEO, Pasquale Rotella. Yet, the procedural problems and hyperbole are by far the smallest of the numerous pleading deficiencies.

Indeed, Counter-Plaintiffs: (1) sue for fraud that is expressly disclaimed in a non-reliance provision; (2) run afoul of the "right to rely" on your adversary doctrine promulgated by *Pettinelli* and *Columbus Hotel*; (3) pursue claims that are released by the Settlement Agreement; (4) improperly rely on puffery and future promises; (5) fail to plead fraud and misrepresentation with specificity; (6) disregard the independent tort doctrine; (7) sue for claims in this forum after delegating adjudicating authority over such claims to a private judge; (8) sue for breach of a covenant of good faith and fair dealing without tethering such claims to a provision of a contract; (9) fail to meet the plausibility standard for their breach of contract claim; (10) allege that an alleged prior breach by Insomniac excused their performance under the Settlement Agreement in

the face of an "Independent Covenants" provision; (11) improperly rely on and publish certain alleged statements made at a confidential mediation; and (12) levy impertinent and scandalous personal attacks against Mr. Rotella that should be stricken.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, (2007)). "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007); *see also Associated Builders, Inc. v. Ala. Power Co.,* 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."); *Simmons v. Peavy–Welsh Lumber Co.,* 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").

## ARGUMENT

I. **COUNTER-PLAINTIFFS' CLAIM FOR FRAUDULENT INDUCEMENT (COUNT VIII) & NEGLIGENT MISREPRESENTATION (COUNT IX) MUST BE DISMISSED**

### a. **The Settlement Agreement Contains a Valid Non-Reliance Provision**

At mediation, the Parties signed the BTS. The Settlement Agreement was not signed until a month later following weeks of back-and-forth negotiations and after Counter-Plaintiffs improperly helped themselves to the Settlement Payment. Integral to its execution and to avoid the specious allegations alleged in Counter-Plaintiffs' Counterclaim, the Parties agreed as follows:

> **23. Reliance on Own Counsel.** In entering into this Agreement, the Parties acknowledge that they have relied upon the legal advice of their respective attorneys, who are the attorneys of their own choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Party. The Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied, upon any representation or statement, whether oral or written, made by the other Party or by that other Party's

3

agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

Countercl. Ex. B, § 23.

Counter-Plaintiffs concede—in fact, they *allege*—that Mr. Rotella is a representative and/or agent of Insomniac. *See* Countercl. ¶ 3 ("Rotella is Insomniac's Chief Executive Officer"). They also allege (as is the case) that Mr. Rotella was a representative of Insomniac at the mediation and made statements on behalf of Insomniac. *See id.* ¶¶ 76, 77. Nonetheless, Counter-Plaintiffs now allege, in a conclusory fashion, that Mr. Rotella made certain statements through unnamed agents at mediation a month prior to the execution of the Settlement Agreement.

Fatal to their claim, however, is the fact that Counter-Plaintiffs unambiguously represented in the Settlement Agreement that "other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Party." *id*. Ex. B § 23. And, while Counter-Plaintiffs now allege that they relied upon these contractually disavowed statements, Counter-Plaintiffs represented in the Settlement Agreement that "[t]he Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied, upon any representation or statement, whether oral or written, made by the other Party or by that other Party's agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise." *Id*. This clause and Counter-Plaintiffs' representations therein requires dismissal with prejudice of Counter-Plaintiffs' fraudulent inducement and negligent misrepresentation claims. *Griffin Indus., Inc.,* 496 F.3d at 1206 ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."); *see also Associated Builders, Inc.,* 505 F.2d at 100 ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."). Though not binding, the Seventh Circuit's opinion in *Rissman* summarizes the argument succinctly: the "law does not permit a party to a [] transaction to disavow such representations—to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000).

The rule is the same in the Eleventh Circuit.  *See, e.g., Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1288 (11th Cir. 1998) (where contract included statement that "no representations, warranties or inducements have been made to any party . . . other than the representations, warranties and covenants contained and memorialized in such documents," plaintiff's fraud claim for damages was properly dismissed); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007); *Khanimov v. St. Tropez II, LLC*, 2009 WL 10667414, at *3 (S.D. Fla. July 1, 2009) (dismissing cause of action requiring allegations of reasonable reliance where "plaintiff's allegations that he relied on the representations of Defendant [we]re squarely contradicted by the Purchase Agreement" which contained a non-reliance clause).   Indeed, to state a claim for fraudulent inducement or negligent misrepresentation, Counter-Plaintiffs must plausibly plead reliance.  The nonreliance language of the Settlement Agreement quoted above confirms they cannot. *Trilogy Properties LLC v. SB Hotel Assocs. LLC*, 2010 WL 7411912, at *9 (S.D. Fla. Dec. 23, 2010) (plaintiff cannot show reasonable reliance "if a contract states that the party cannot rely on previous assurances and representations").  "[A] contractual agreement to "forego reliance on any prior false representation and limit . . .  reliance to the representations . . . expressly contained in the contract" has the binding effect of negating an action based on fraud in the inducement." *Billington v. Ginn-La Pine Island, Ltd.*, LLLP, 192 So. 3d 77, 80–81 (Fla. 5th DCA 2016) (citing *La Pesca Grande Charters, Inc. v. Moran*, 704 So.2d 710, 714 n. 1 (Fla. 5th DCA 1998)).

Claims for fraudulent inducement are barred when the alleged misrepresentation explicitly contradicts an unambiguous provision in a written contract. *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286 (M.D. Fla. 2009); *Mac–Gray Services, Inc. v. DeGeorge*, 913 So.2d 630 (Fla. 4th DCA 2005); *Wadlington v. Continental Medical Services, Inc.*, 728 So.2d 352 (Fla. 4th DCA 1999); *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.*, 262 F.Supp.2d 1334 (S.D. Fla. 1999), aff'd, 235 F.3d 1344 (11th Cir. 2000) (applying Florida law); *Rosa v. Amoco Oil Co.*, 262 F.Supp.2d 1364 (S.D. Fla. 2003) (applying Florida law) (negative treatment on other grounds). Thus, statements or alleged misrepresentations made to induce an individual to enter a contract, if later contained within the terms of the actual contract, cannot constitute a basis on which to bring a fraud claim.  Here, Counter-Plaintiffs' allegation that they justifiably relied on certain pre–Settlement Agreement statements is contradicted by a contractual provision expressly representing that they did not so rely.

The facts in *Yamashita v. Merck & Co., Inc*., No. 11-62473-CIV, 2013 WL 275536, at *4–5 (S.D. Fla. Jan. 24, 2013) are analogous here.  In *Yamashita*, the defendant sought dismissal with prejudice of the plaintiff's claims as being barred by the general release of the separation agreement executed by the parties. The plaintiff sued for fraudulent inducement seeking to avoid application of the release provision.  The *Yamashita* court dismissed the fraudulent inducement claims and held as follows:

> "The law is clear: A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or dealt with, or expressly contradicted, in a later written contract."

No. 11-62473-CIV, 2013 WL 275536, at *4–5 (citing *Giallo v. New Piper Aircraft, Inc*., 855 So.2d 1273 (Fla. 4th DCA 2003); *see also Taylor Woodrow Homes Florida, Inc*. v. 4/46–A Corp., 850 So.2d 536 (Fla. 5th DCA 2003); *Englezios v. Batmasian*, 593 So.2d 1077 (Fla. 4th DCA 1992).

Like Counter-Plaintiffs here, the plaintiff in *Yamashita* sought to circumvent an agreement's nonreliance clause by claiming that he was fraudulently induced to execute the agreement. The *Yamashita* court rejected this argument and held, "courts routinely honor non-reliance clauses, refusing to allow parties to rely on promises or representations made outside the contract." *Yamashita*, No. 11-62473-CIV, 2013 WL 275536, at *4–5 (citing *Taylor Woodrow Homes Fla., Inc*. 850 So.2d at 542–43.  The *Yamashita* court went on to state:

> When the contract itself includes a clear and unambiguous non-reliance provision (confirming that Plaintiff carefully read and fully understood the entire document, including the "General Release" and "other Provisions" sections, and that he understood "that they represent the entire understanding between the Company and me and I have not relied upon any other representation or statement (either written or oral) concerning the reasons for my termination or the terms of this document"), any alleged reliance upon an oral representation outside of the settlement agreement is legally unjustified.

*Yamashita*, No. 11-62473-CIV, 2013 WL 275536, at *4–5 (citing *White Const. Co., Inc. v. Martin Marietta Materials, Inc*., 633 F.Supp.2d 1302 (M.D. Fla. 2009)).  Reliance on fraudulent representations is unreasonable as a matter of law under such circumstances. *Topp, Inc. v. Uniden America Corp*., 513 F.Supp.2d 1345 (S.D. Fla. 2007); *Billington*, 192 So. 3d at 80–81 ("a contractual agreement to 'forego reliance on any prior false representation and limit ... reliance to the representations ... expressly contained in the contract' has the binding effect of negating an action based on fraud in the inducement")  (citing *La Pesca Grande Charters, Inc*., 704 So.2d at 714 n. 1).

Judge Tjoflat's concurrence in *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010) is instructive.  In *Thompson*, the district court dismissed a securities fraud claim.  The Eleventh Circuit affirmed the dismissal and even vacated and remanded the district court's denial of the defendants' motion for Rule 11 sanctions.  Judge Tjoflat believed that plaintiff's Section 10(b) claim was "so frivolous that the district court necessarily abused its discretion when it denied sanctions," and thus "that the Court of Appeals should have imposed sanctions on its own."  *Id.* at 640 (Tjoflat, J., concurring in part).  Specifically, Judge Tjoflat referenced the plaintiff's allegation that, to induce the plaintiff to acquire the stock, the defendants falsely represented that "the shares would be registered and could be quickly sold for a profit."  *Id.* at 678.  Judge Tjoflat reasoned "any argument that [plaintiff] justifiably relied on [this] misrepresentation [wa]s frivolous" in light of a provision in the stock purchase agreement that "no representations or warranties ha[d] been made to [plaintiff]" and that plaintiff was "not relying on any information, other than that contained in the Offering documents."  *Id.*

While this is not a motion for sanctions, Judge Tjoflat's reasoning applies with equal force here. Counts VIII (fraudulent inducement) and IX (negligent misrepresentation) of Counter-Plaintiffs' Counterclaim must be dismissed with prejudice.

### b. The Counterclaim Must be Dismissed Because Counter-Plaintiffs Did Not Have the "Right to Rely" on their Adversary Under *Pettinelli & Columbus Hotel*

The Eleventh Circuit and Florida Supreme Court are aligned: you do not have the right to rely on your adversary.  To wit, a party to a dispute cannot claim that their adversary fraudulently induced another party into executing a settlement or release.  *Pettinelli v. Danzig*, 722 F.2d 706 (11th Cir. 1984).  The common law remedy for fraud requires that the plaintiff show that the defendant (1) made a false representation of fact, (2) that the defendant knew was false when made, and (3) that the representation was made for the purpose of inducing the plaintiff to act in reliance of it.  *Cavic v. Grand Bahama Devel. Co., Ltd*., 701 F.2d 879 (11th Cir. 1983).  The misrepresentation must be about a present or past fact rather than a future fact.  *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 195 (5th Cir. 1979), on reh'g, 611 F.2d 105 (5th Cir. 1980).  Relevant here, however, is another element of common law fraud that was enunciated *in Columbus Hotel Corp. v. Hotel Management Co*., 116 Fla. 464, 156 So. 893 (1934) and expanded in *Pettinelli*, 722 F.2d 706.

The Eleventh Circuit in *Pettinelli*, relying on *Columbus Hotel Corp.*, confirmed the Florida Supreme Court's rule that "in addition to the enumerated three criteria, fraud requires a showing that the plaintiffs had a right to rely on the representations and that this right to rely is absent when the allegedly fraudulent statement is made by an adversary." *Pettinelli*, 722 F.2d at 706 (citing *Columbus Hotel Corp.*, 116 Fla. 464, 156 So. 893).

*Pettinelli* has been cited over 500 times, including in *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117–19 (11th Cir. 1999), which has been cited over 1700 times and where the Eleventh Circuit affirmed a dismissal with prejudice of claims nearly identical to those alleged here.  In *Mergens*, the plaintiffs entered into a release agreement with the defendants.  The parties were in a dispute, an adversarial relationship, and, like the instant case, the release agreement resolved a lawsuit threatened by the plaintiff.  The plaintiffs then contended that they were fraudulently induced to enter into the settlement and release:

> The parties had been in an adversarial relationship since well before the execution of the Agreement. Finally, the Mergenses entered into the Agreement, in part, to settle a lawsuit threatened by the Plaintiff–Appellants that claimed fraud. Based on the posture of the parties prior to the execution of the Agreement, the district court correctly held that the Mergenses had no legal right to rely on the representations. . . .

*Id*.

The Mergenses contended that they were justified in relying on representations set forth in the written agreement, no matter how adversarial the relationship might be.  The *Mergens* court disagreed and noted that, the while the Mergenses could sue for breach of contract to the extent a contractual provision or representation was breached, the Mergenses could not sue for fraud based upon allegedly false statements of their adversary made to induce the execution of a release agreement.  *Id*.

Like the instant case, "[t]he Mergenses . . . contend[ed] that they justifiably relied on misrepresentations made to 'neutral' third parties, i.e., parties with whom the Defendant–Appellees were not in an adversarial relationship, and that these misrepresentations [could] form the basis of their fraud claims."  The Eleventh Circuit again rejected this contention stating simply: "[w]e do not agree," and "[t]he Mergenses had no right to rely on any representation presented by Dreyfoos to a third party."  *Id*.

Similarly, a sister court in this District, as affirmed by the Eleventh Circuit in *Florida Evergreen Foliage*, outlined what it referred to as the bright-line test in *Mergens*:

> The Eleventh Circuit established a bright-line test in *Mergens* regarding a party's legal right to rely on the representations of another party prior to entering an agreement which it succinctly stated as: 'when negotiating or attempting to compromise an existing controversy over fraud and dishonesty it is unreasonable to rely on representations made by the allegedly dishonest parties.' Specifically, the Court of Appeals found in *Mergens* that reliance on the defendants' misrepresentations and/or omissions was unjustified, as a matter of law, because: (a) the plaintiffs were sophisticated players in the industry and were represented by counsel; (b) the parties had been in an adversarial relationship since well before the execution of the agreement; and (c) the existing controversy between the parties involved allegations of fraud and/or dishonesty by the defendants. Based on this rule and its application in *Mergens,* this Court is obliged to find that Plaintiffs cannot establish reasonable reliance and to grant DuPont's motion for judgment on the pleadings.

*Florida Evergreen Foliage v. E.I. Du Pont De Nemours, Co*., 135 F. Supp. 2d 1271, 1290 (S.D. Fla. 2001) (internal citations omitted), aff'd sub nom *Green Leaf Nursery v. E.I. DuPont De Nemours & Co*., 341 F.3d 1292 (11th Cir. 2003).  And, in entering judgement on the pleadings on a fraudulent inducement claim similar to the one alleged here, another sister court in this District in *Morrison v. Delray Med. Ctr., Inc*., 2024 WL 1703078, at *6 (S.D. Fla. Apr. 19, 2024), expounded on the *Pettinelli*/*Columbus Hotel* progeny and offered the following quote and collection of cases:

> Applying the *Columbus Hotel* rule to settlement agreements, a line of binding Eleventh Circuit cases holds that, as a matter of law, a person represented by counsel cannot justifiably rely on a statement made by an adverse party who that person has accused of fraud or dishonesty. *See, e.g., Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir. 1984) ("When negotiating or attempting to compromise an existing controversy over fraud and dishonesty it is unreasonable to rely on representations made by the allegedly dishonest parties."); *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1305 (11th Cir. 2003) ("Because Plaintiffs were represented by counsel, were in an antagonistic and distrusting relationship with DuPont, and settled litigation that included accusations of fraud and other dishonest conduct by DuPont, Plaintiffs could not reasonably or justifiably rely on any of DuPont's misrepresentations."); *Mergens v. Dreyfoos,* 166 F.3d 1114, 1118 (11th Cir. 1999) (no justifiable reliance where plaintiff was sophisticated litigant represented by counsel, parties had an adversarial relationship, and parties were settling a potential lawsuit that would have included allegations of fraud); *Affliati Network, Inc. v. Wanamaker,* 847 F. App'x 583, 586-87 (11th Cir. 2021) ("[W]hat was central to our analysis in [*Mergens* and *Green Leaf]* was that the plaintiffs were represented by counsel, 'in an antagonistic and distrusting relationship' with the defendants, and had settled litigation, or threatened litigation, 'that included accusations of fraud and other dishonest

conduct.' ").

Here, the Counterclaim makes clear that the Parties were adversarial prior to the execution of the Settlement Agreement.   The Parties attended a mediation to resolve a dispute, and the Counter-Plaintiffs' entire fraud in the inducement claim is predicated on statements made at the very mediation held to settle the dispute.   Indeed, Counter-Plaintiffs, in paragraphs 48-49 of their Counterclaim, allege that:

> Rotella is not just a criminal and a fraud. He is also insufferable to work with.  The CDD Parties have had the misfortune of witnessing and experiencing first-hand Rotella's cruelty, self-centeredness, and volatility towards his business partners and/or employees.  Rotella's self-absorbed mindset makes him and Insomniac impossible to collaborate with.

Yet, in the face of these allegations and the *Pettinelli* and *Columbus Hotel* cases and their progeny*,* Counter-Plaintiffs somehow seek to convince this Court that they justifiably relied on statements made by such a purportedly dishonest person during a mediation to resolve a dispute. Importantly too, Counter-Plaintiffs were represented by counsel during the mediation and prior to the execution of the Settlement Agreement. This is confirmed by the "Reliance on Own Counsel" provision in Section 23, and the screenshot in paragraph 106 of the Counterclaim referencing Counter-Plaintiffs' attorney.   Thus, Count VIII (Fraud in the Inducement) must be dismissed.

### c.  **Counter-Plaintiffs' Negligent Misrepresentation Claim is Barred by the Release**

It is peculiar that Counter-Plaintiffs sue for negligent misrepresentation based upon statements made prior to the execution of the Settlement Agreement.  Indeed, all such claims were expressly released.  Though their fraud claims are empty, their inclusion is perhaps understandable based upon the mistaken belief that procurement through fraud may make the Settlement Agreement voidable.  That justification, however, is not present with negligent misrepresentation.

Section 8 of the Settlement Agreement states as follows:

Limited Mutual Release.

(a) The Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers,   directors, shareholders, interest holders, members,  partners,  attorneys,  agents,  employees,  managers,  representatives, assigns, and successors in interest, and all persons acting by, though, under, or in concert with them, and each of them, **hereby release and discharge the other**

> **Parties, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them**, and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which any Party has, or may have had, against the other Parties, whether or not apparent or yet to be discovered, related to and/or arising from the Factory Town Venture, Factory Town, FTIG, FT Miami, FTINS, the FT Parties, the CDD Services, the Dispute, and/or the January 2024 Agreements ("Released Claims"). Nothing herein shall be construed as a release of claims that accrued after the Effective Date or the Parties obligations under this Agreement or the Term Sheet. Nothing here in shall be construed as a release of claims by Factory Town Holdings, LLC.

Countercl. Ex. B. § 8.

As alleged in paragraph 3 of the Counterclaim, Mr. Rotella was Insomniac's Chief Executive Officer and is therefore included within the released parties in the limited mutual release above. The claims asserted in the Counterclaim undoubtedly relate to and/or arise from the Factory Town Venture, Factory Town, CDD Services, and the Dispute. And the allegedly negligent misstatements were made prior to the execution of the Settlement Agreement.[1] They are, therefore, categorically barred.

While this is common sense, *Mergens* is again instructive and states, under Florida law, "[t]he validity and effect of a settlement and release are governed by contract law." *Mergens*, 166 F.3d 1114 at 1117 (citing *Travelers Insurance Co. v. Horton*, 366 So.2d 1204 (Fla. 3rd DCA 1979)). "A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract." *Mergens*, 166 F.3d 1114, 1117 (citing *Medical Center Health Plan v. Brick*, 572 So.2d 548, 551 (Fla. 1st DCA 1990)).

---

[1] Counterclaim ¶ 196 ("Rotella stated to the CDD Parties during the June 2, 2025, mediation before Judge Hanzman and during the parties' subsequent negotiations in finalizing the Settlement Agreement . . . .")

The plaintiffs in *Mergens*, like Counter-Plaintiffs here, agreed to release not only Insomniac, but also its officer, Mr. Rotella, from any and all causes of action from the beginning of time to the date the agreement was signed. The Parties agreed that the Settlement Agreement represented the entire understanding of the Parties and that any prior representation was superseded by the current contract. Countercl. Ex. B § 17. In affirming dismissal in *Mergens*, the Eleventh Circuit held:

> The district court was correct in holding that the general release unambiguously bars all actions premised on claims that arose before, and contemporaneous to, the execution of the Agreement. The only question remaining is whether the Mergenses can establish that the release was procured by fraud, thereby making it voidable.

*Mergens*, 166 F.3d at 1117; *see also Pettinelli* 722 F.2d 706 (claims prior to release were barred); *Columbus Hotel Corp.*, 116 Fla. 464, 156 So. 893, *Morrison*, No., 2024 WL 1703078, at *6 (granting judgment on the pleadings because conduct encompassed by release, which occurred prior to the date of the release was, in fact, released).

Counter-Plaintiffs' negligent misrepresentation claim predicated on prerelease statements made at mediation is frivolous and warrants dismissal with prejudice.

### d. Counter-Plaintiffs' Claims Fail Because the Allegedly False Statements are Mere Puffery, not a Statement of a Past or Present Fact

As noted above, the subject matter of the dispute is encompassed in a written agreement: the Settlement Agreement. Counter-Plaintiffs here, however, seek—as they promised they would—to include personal claims and attacks against Mr. Rotella. To do so, they tried and failed the square-peg round hole approach. But even assuming the Settlement Agreement did not exist, and the *Columbus Hotel* doctrine was inapplicable, the claims against Mr. Rotella fail because the alleged statements cannot support a claim for fraud. In a nutshell, Counter-Plaintiffs claim that they relied upon "Rotella's and Insomniac's intention to collaborate in good faith with the CDD Parties on Hocus Pocus and Art Basel." Countercl. ¶¶ 77, 79. These, however, are precisely the sort of statements Florida law says cannot be the basis of a fraudulent inducement claim.

"A false statement amounting to a promise to do something in the future is not actionable fraud." *Maunsell v. Am. Gen. Life & Acc. Ins. Co.*, 707 So. 2d 916, 917 (Fla. 3d DCA 1998) (citing *Sleight v. Sun and Surf Realty, Inc*., 410 So.2d 998, 999 (Fla. 3d DCA 1982); *see also Stoler v. Metropolitan Life Ins. Co.,* 287 So.2d 694 (Fla. 3d DCA 1974); *Evans v. Gray,* 215 So.2d 40 (Fla. 3d DCA 1968), cert. denied*,* 222 So.2d 748 (Fla. 1969). The misrepresentation must be about a present or past fact rather than a future fact. *Cameron*, 608 F.2d at 195; *see Gemini Investors III,*

*L.P. v. Nunez*, 78 So.3d 94, 97 (Fla. 3d DCA 2012) ("Generally, the fraudulent statement must concern a past or existing fact."). Puffery, which "comprises generalized, vague, nonquantifiable statements of corporate optimism" are not actionable as fraud. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (holding that proclamations that a company "expect[s] to continue to allocate significant resources" are not actionable as securities fraud).

Similar to Counter-Plaintiffs here, who allege reliance upon Mr. Rotella's promise of future collaborative work, the plaintiff in *Maunsell* sued for fraud in the inducement based upon the promise of a promotion. 707 So. 2d 916, 917. The plaintiff claimed that he was induced to leave his prior employer to work for American General Life based upon these false promises of a superior role in the future. *Id.* Florida's Third District Court of Appeal held that "American General's future promises regarding Maunsell's promotion and hiring of staff, which were to occur three months after employment, are not actionable as fraud." *Id.* Here, the allegedly fraudulent statements are even more amorphous than those in *Maunsell*, with Counter-Plaintiffs citing some non-descript collaboration or, even worse, simply referring to the requirements in the Settlement Agreement, thereby running afoul of the Independent Tort Doctrine.

### e.   Counter-Plaintiffs Fail to Meet the Heightened Pleading Standard for Fraud Claims and the Complaint Comprises an Impermissible Shotgun Pleading

"[A] party must state with particularity the circumstances constituting fraud ...." Fed.R.Civ.P. 9(b). The purpose of this requirement is to alert the defendant to the "precise misconduct with which [it] [is] charged" and to protect the defendant "against spurious charges of immoral and fraudulent behavior." *Brooks v. Blue Cross and Blue Shield of Florida, Inc*., 116 F.3d 1364, 1370–71 (11th Cir. 1997) (quotation marks and citations omitted). This requirement is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations ..., and (2) the time and place of each such statement and the person responsible for making ... same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001).

Importantly too, Rule 9(b)'s heightened pleading requirements apply to negligent misrepresentation claims. *Lamm v. State Street Bank and Trust*, 749 F.3d 938, 951 (11th Cir. 2014). Because negligent misrepresentation is subject to the heightened pleading standard of Rule 9(b), a plaintiff must establish "the 'who, what, when, where, and how' of the fraud." *Ceithaml*, 207 F. Supp. 3d at 1353 (citing *Garfield v. NDC Health Corp*., 466 F. 3d 1255, 1262 (11th Cir. 2006).

As described in more detail below, Counter-Plaintiffs here shockingly ignore mediation confidentiality and claim—albeit falsely—that certain statements were made at mediation.  Given the severity of consequences for violating this rule, one would think that if Counter-Plaintiffs were going to shoot their shot, they would be sure not to miss.  But they did.  Counter-Plaintiffs allege, without specificity, that Mr. Rotella communicated—through unnamed agents[2]—certain non-specific information that simultaneously falsely induced three sophisticated businesspeople and four businesses to enter into a term sheet at a mediation, and then, somehow a month later, induced them to sign a Settlement Agreement, in which Counter-Plaintiffs expressly represented that they had not relied on such statements.  The truth is, during the mediation, Mr. Rotella did not directly or indirectly convey anything to Counter-Plaintiffs, but that will be addressed later if this Counterclaim survives scrutiny.  The Counterclaim similarly fails because it lumps all Counter-Plaintiffs together into allegations and counts, without detailing which Counter-Plaintiff allegedly heard or relied on what statement.

As such, counts VIII (fraudulent inducement) and IX (negligent misrepresentation) must be dismissed on this additional basis.

## II.    COUNTER-PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY CLAIMS IN COUNTS III AND IV MUST BE DISMISSED BECAUSE THEY RUN AFOUL OF THE INDEPENDENT TORT DOCTRINE

Counter-Plaintiffs, continuing with the square peg-round hole approach, allege that the Settlement Agreement, which separates the Parties, created a partnership.  Counter-Plaintiffs then claim that Insomniac breached its fiduciary duties to its partners.  Fatal to their claims, however, is the fact that their fiduciary duty claims are based upon the same contractual terms and same allegations as those purporting to support Counter-Plaintiffs' breach of contract claims.  This requires dismissal.

Florida's "independent tort doctrine bars recovery in tort for actions that challenge a breach of contract[.]"  *Pastor v. Bank of Am., N.A*., 664 F. Supp. 3d 1365, 1367 (S.D. Fla. 2023) (quoting *Stepakoff v. IberiaBank Corp.*, No. 22-cv-20286-BLOOM/Otazo-Reyes, 637 F.Supp.3d 1309, 1315 (S.D. Fla. Oct. 31, 2022) (Bloom, J.).  In other words, the doctrine prohibits a claimant from "repackag[ing] [ ] breach of contract claims as independent actions in tort." *Id.*: *see also Spears v.*

---

[2] The only other individual who was alleged to have attended the mediation was Insomniac's General Counsel, who is a representative of Insomniac, not of Mr. Rotella, and of course, Judge Hanzman, the Mediator.

14

*SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) ("District courts in Florida have thus held that it is well settled that a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims.") (internal quotation marks omitted). "Therefore, to set forth a claim in tort between parties in contractual privity, a party must allege action beyond and independent of breach of contract that amounts to an independent tort." *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, 2014 WL 2215770, at *4, (S.D. Fla. May 29, 2014) (Rosenbaum, J.) (dismissing plaintiff's fraudulent inducement claim because it was "precisely the same as a potential breach-of-contract claim").

"The case law does not support a finding of a breach of fiduciary duty when the breach of fiduciary duty rests on the contractual relationship itself." *See Griffin v. Motorsport Games Inc.*, No. 24-CIV-21929, 2024 WL 4564330, at *9 (S.D. Fla. Oct. 24, 2024); *see also Deltec Bank & Tr. Ltd. v. Carbonara*, No. 25-20978-CIV, 2025 WL 1913204, at *10 (S.D. Fla. July 9, 2025), report and recommendation adopted, No. 25-20978-CIV, 2025 WL 1984299 (S.D. Fla. July 17, 2025); *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.,* 208 F.Supp.2d 1310, 1317 (S.D. Fla. 2002) (granting a motion to dismiss a breach of fiduciary duty claim because the allegations for the breach of fiduciary duty claim were not independent of the parties' contracts); *Detwiler v. Bank of Central Fla.,* 736 So.2d 757, 759 (Fla. 5th DCA 1999) (holding "a cause of action for breach of fiduciary duty will not lie where the claim of breach is dependent upon the existence of a contractual relationship between the parties").

Here, Counter-Plaintiffs' breach of fiduciary duty claims in counts III and IV are nearly identical to their breach of contract claims. More specifically, in counts III and IV, Counter-Plaintiffs allege Insomniac breached its fiduciary duty to a non-existent partnership because they allegedly "refused to cooperate with CDD Parties on Hocus Pocus and Art Basel." Countercl. ¶¶ 144, 151.

These allegations are nearly identical to the allegations supporting counts I and II, both of which rely principally on allegations that Insomniac "repeatedly failed to collaborate with the CDD Parties on Hocus Pocus and Art Basel." Countercl. ¶¶ 132, 136.

As a result, counts III and IV for breach of fiduciary duty must be dismissed as running afoul of the Independent Tort Doctrine. *See Pastor*, 664 F. Supp. 3d at 1367 (applying independent tort doctrine and dismissing claims for breach of fiduciary duty against a bank with prejudice

where the plaintiff did not even plead a breach of contract because "it [was] impossible to separate [the plaintiff's] . . . breach of fiduciary duty claims from his underlying contractual relationship.").

**III.   DEFENDANT'S BREACH OF CONTRACT CLAIM AND BREACH OF GOOD FAITH AND FAIR DEALING CLAIMS MUST BE DISMISSED.**

    **a.   Disputes relating to Talent Bookings were Delegated to Judge Hanzman for Adjudication**

Counter-Plaintiffs claim that Insomniac breached what they refer to as the "Reasonable Approval Provision" of the Settlement Agreement, though, as noted below, they never allege that Counter-Defendants withheld approval.  In quoting the provision, however, Counter-Plaintiffs omitted a critical portion of the actual text.  Counter-Plaintiffs, in their Counterclaim, state:

> The Settlement Agreement further provides that, for both Hocus Pocus and Art Basel, the CDD Parties "shall initially propose all talent/artists and submit proposed offers/contracts/agreements at market rates to Insomniac prior to execution for their review and approval, such approval not to be unreasonably withheld" (the "Reasonable Approval Provision").

Countercl. ¶ 85.  As seen in the Counterclaim's attachment, what the Settlement Agreement actually says is:

> Except to the extent contracts with talent/artist are already fully executed, SDC shall initially propose all talent/artists and submit proposed offers/contracts/agreements at market rates to Insomniac prior to execution for their review and approval, such approval not to be unreasonably withheld. **In the event of any dispute regarding contracting for talent, the dispute shall be submitted on an expedited basis to Judge Michael Hanzman for his determination.**

Countercl. Ex. B. § 6(b)(v) (emphasis added).  And the parties did that.  On July 23, 2025, the Parties submitted Counter-Plaintiffs' dispute to Judge Hanzman.  Tellingly, Counter-Plaintiffs reference and creatively quote Judge Hanzman's order—but do not attach it.  Their reference to it, however, makes clear that it is properly relied upon here. *See Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1319 (S.D. Fla. 2014) (court "may consider documents attached to the complaint or incorporated by reference without converting the motion to one for summary judgment" when the documents are central to the pleading and their authenticity is not disputed).[3]

---

[3] For the Court's convenience, although Judge Hanzman's July 31, 2025, order ("Hanzman Order") is attached as Exhibit G to the Complaint, a true and correct copy of the Hanzman Order is attached hereto as **Exhibit A**.

Counter-Plaintiffs lost emphatically.  With respect to the booking of talent, Judge Hanzman held, inter alia, that "Insomniac has final approval rights for all Talent Bookings."  Ex. A § II ¶ 7. Judge Hanzman went on to note that "Should the CDD Parties believe Insomniac is unreasonably withholding consent, they may bring the issue to the undersigned for adjudication." *Id*. § II ¶ 8. [4]

As noted in Plaintiff's Complaint and confirmed by Counter-Plaintiffs' Counterclaim, the very next day after the Hanzman Order, Counter-Plaintiffs informed Plaintiff that they would not be complying with the Settlement Agreement or Judge Hanzman's Order.  Counter-Plaintiffs' Counterclaim confirms as much in paragraph 125, where it alleges that, on August 1, 2025, the day following the Hanzman Order, Counter-Plaintiffs refused to continue cooperation.  In other words, Counter-Plaintiffs decided to treat the Settlement Agreement as "heads I win, tails I sue," and breached the Settlement Agreement because the Hanzman Order didn't go their way.

### b. Disputes Relating to Allocation of Expenses Were Delegated to Judge Hanzman for Adjudication

Furthering the theme of Counter-Plaintiffs' quasi-forum shopping, the Settlement Agreement also states:

> The Parties are currently have a disagreement over responsibility for and/or allocation of certain budget items. The Parties will cooperate in good faith to prepare an agreed upon line-item budget of estimated event revenue and expenses to be utilized for the purposes of forecasting and ultimately determining final figures to allocate payments for Hocus Pocus and Art Basel ("Line-Item Estimate"). The Parties acknowledge that the Line-Item Estimate shall not be exclusive, but is an estimate of the items to be utilized in determining profits for purposes of paying the CDD Parties and Space Invaders pursuant to this Agreement To the extent the Parties are unable to agree to a line-item Estimate by or before July 25, 2025 in order to determine profits, the Parties shall set a hearing before Judge Michael Hanzman, who shall evaluate the respective positions of the Parties and make a determination. **The determination of Judge Hanzman shall be binding and non-**

---

[4] The Hanzman Order also noted that Counter-Plaintiffs were trying to rewrite the Settlement Agreement and attempted to force Insomniac to pay for expenses not provided for therein.  While Counter-Plaintiffs have tried to recast the Hanzman Order as something less harmful to their cause, the Hanzman Order says what it says, and they cannot change that.  Moreover, Counter-Plaintiffs again include a selective quotation in their allegation that Judge Hanzman "agreed" with the Counter-Plaintiffs in an email. In fact, what he said, in response to Counter-Plaintiffs' counsel advising that Counter-Plaintiffs would not be putting on the Hocus Pocus and Art Basel events: "if your client has decided not to put on the events, I agree with you that there is nothing left for me to deal with, as a Court will have to adjudicate whether it was relieved from any obligations to perform (ie put on the events) due to a prior material breach on the part of Insomniac, **or whether by failing to put on the events it breached the SA**. " *See* Dkt. 33-8 (emphasis added).

> **appealable. To the extent there is a dispute over a line item added to the Line-Item Estimate following Art Basel or Hocus Pocus, the Parties shall set a hearing before Judge Michael Hanzman, who shall evaluate the respective positions of the Parties and make a determination. The determination of Judge Hanzman shall be binding and non-appealable.** The payment of the fees by Space Invaders, LLC, for Art Basel and Hocus Pocus does not create any obligation for Insomniac to pay fees for any future event, whether at Factory Town or otherwise with any future payment obligations by Insomniac to any other party being expressly disclaimed hereby. For all such evaluations and determinations under this section, Judge Hanzman shall also consider the terms of the Term Sheet.

Countercl. Ex. B, § 6(c)(iii) (emphasis added).

As noted above and seen in Exhibit A, the Parties did just that and Counter-Plaintiffs' position that Insomniac should pay for items not provided for in the Settlement Agreement was—for all intents and purposes—wholly rejected.  As noted in paragraph seven of the Hanzman Order, Counter-Plaintiffs asked that Judge Hanzman "reserve ruling;" however, even then Judge Hanzman noted that when his final ruling came down, it would be under the backdrop outlined in his order.  That is, Counter-Plaintiffs argued that expenses outside of those listed in the Settlement Agreement should be borne by Insomniac (Ex. A § III ¶ 2), while "Insomniac argue[d] that only those items listed in the Settlement Agreement [were] included . . .." *Id*. § III ¶ 3.  Judge Hanzman noted that he did not see how "Insomniac is remotely required to provide" the things that Counter-Plaintiffs sought.  *Id*. § III ¶ 6.  As seen by the screenshots in the Counterclaim, within 24 hours Counter-Plaintiffs noted that they would not be performing their obligations under the Settlement Agreement. Countercl. ¶¶ 125.[5]

Counter-Plaintiffs cannot now, after seeing the proverbial writing on the wall, run to this Court to avoid adjudication by Judge Hanzman, the agreed arbiter of disputes.

The Court should not entertain Counter-Plaintiffs' attempts to relitigate issues in a different forum because the contracted-for forum didn't go their way.  The Court should stay or dismiss all claims under the Settlement Agreement and compel the Parties to have the matter adjudicated by Judge Hanzman. *See Pardes v. Pardes*, 404 So. 3d 543, 544 (Fla. 3d DCA 2025) (trial court lacked

---

[5] In reality, Mr. Weil, counsel for the Counter-Plaintiffs, sent an email at 10:13 p.m., July 31, 2025, the same day as the Hanzman Order was entered just 6 hours earlier at 3:33 p.m.  In other words, a mere 6 hours following entry of the Hanzman Order rejecting Counter-Plaintiffs' positions, they informed Insomniac and Judge Hanzman that they would not be complying with the Settlement Agreement.  Their commitment to non-compliance was confirmed again by Mr. Weil and Davide Danese the following day on August 1, as seen in paragraph 125 of the Counterclaim.

jurisdiction to take up matters the parties sent to a private judge under section 44.104, Florida Statutes); *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010) (appellate court "bound by the factual findings of the trial resolution judge.").

Alternatively, the Settlement Agreement's clauses delegating authority to adjudicate disputes to Judge Hanzman are functionally an agreement to arbitrate by a named neutral and must be enforced under the FAA, with the case stayed upon request. *See Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005). Or, at a minimum, the contractual claims should be dismissed or stayed for failure to satisfy a condition precedent to suit, just as this Court routinely does with contractual ADR prerequisites. *See 3-J Hospitality, LLC v. Big Time Design, Inc.*, 2009 WL 3586830, at *2 (S.D. Fla. Oct. 27, 2009); *Irby Constr. Co. v. QTI, Inc.*, No. 19-60412 (S.D. Fla. May 14, 2019) (Altman, J.).

### c. Counter-Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing Must be Dismissed for Failure to Tether the Claims to an Express Contractual Provision

Counter-Plaintiffs seem to allege that there is a standalone claim for breach of the covenant of good faith and fair dealing under section 620.8404, Florida Statutes, and that this standalone claim need not be predicated upon a breach of an express contractual provision. This is simply not true. Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract. *Ins. Concepts & Design, Inc. v. Healthplan Services, Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001) (citing *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1315 (11th Cir.1999), cert. denied, 528 U.S. 948, 120 S.Ct. 370, 145 L.Ed.2d 287 (1999)); *Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1438 (S.D. Fla. 1996); *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So.2d 1049, 1050 (Fla. 1997); *Fernandez v. Vazquez*, 397 So.2d 1171, 1174 (Fla. 3d DCA 1981). This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement." *Barnes*, 932 F.Supp. at 1438.

"[T]he implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties." *Ins. Concepts & Design, Inc.*, 785 So. 2d at 1234; *Weaver*, 169 F.3d at 1317–18; *Barnes*, 932 F.Supp. at 1438; *City of Riviera Beach v. John's Towing*, 691 So.2d 519, 521 (Fla. 4th DCA 1997). Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached. *Weaver*, 169 F.3d at 1317–18; *Nautica Int'l, Inc. v.*

*Intermarine* *1235 USA, L.P.*, 5 F.Supp.2d 1333, 1340 (S.D. Fla. 1998) (finding as a matter of law that plaintiff stated claim because it alleged an express breach of contract); *Anthony Distrib., Inc. v. Miller Brewing Co.*, 941 F.Supp. 1567, 1574 (M.D.Fla.1996); *Barnes*, 932 F.Supp. at 1438–39; *Burger King Corp. v. Holder*, 844 F.Supp. 1528, 1530 (S.D. Fla. 1993).

Indeed, "[a] duty of good faith **must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract** which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Hospital Corp. of America v. Florida Med. Ctr., Inc.*, 710 So.2d 573, 575 (Fla. 4th DCA 1998) (emphasis added); *Ins. Concepts and Design, Inc.*, 785 So. 2d at 1234 ("The duty of good faith does not attach until the Plaintiff can establish a term of the contract that HPS was obligated to perform."); *see also Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1314 (11th Cir.1998) ("[G]ood faith requirement does not exist 'in the air'. Rather, it attaches only to the performance of a specific contractual obligation.").

Here, in Count V, Counter-Plaintiffs fail to tether their good faith and fair dealing count to any express term of the Settlement Agreement. Allowing a claim for breach of the implied covenant of good faith and fair dealing "where no enforceable executory contractual obligation" remains would add an obligation to the contract that was not negotiated by the Parties. *Hospital Corp.*, 710 So.2d at 575. Thus, Count V must be dismissed.

### d. <u>Counter-Plaintiffs Fail to State a Plausible Claim for Breach of Contract</u>

This section needs little explanation and only hornbook law. While a breach of contract count is not, unlike the fraud counts, subject to a heightened pleading standard, Counter-Plaintiffs are still required to allege facts that plausibly state a breach of contract claim. *Rohttis v. Sch. Dist. of Lee Cnty.*, No. 2:21-CV-737-JES-NPM, 2022 WL 3028071, at *8 (M.D. Fla. Aug. 1, 2022) (holding the plaintiff "failed to allege a plausible breach of contract claim" due to vagueness of claim).

Here, in counts I and II for breach of contract and breach of covenant of good faith and fair dealing, Counter-Plaintiffs allege that Insomniac breached the "Reasonable Approval" provision pertaining to artist booking. Countercl. ¶¶ 130, 136. However, *not once* do Counter-Plaintiffs allege that Insomniac disapproved of their artist selection for Hocus Pocus or Art Basel. That is because Insomniac did not withhold approval for any of Counter-Plaintiffs' artists selection. But,

in any event, at a minimum, Insomniac is permitted to know who they allegedly rejected for purposes of its defense.

Thus, counts I and II should be dismissed.

> **e.  Counter-Plaintiffs' Breach of Contract Claim Fails to the Extent it Alleges that <u>Prior Breaches Excuse Performance</u>**

The Settlement Agreement states, *inter alia,* **"this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement . . .."** Countercl. Ex. B. § 18.  Counter-Plaintiffs, however, ignore this language and the "Covenants Independent" provision[6] in the Settlement Agreement, and attempt to plead that an alleged prior breach excuses future performance.  *See* Countercl. ¶ 130 ("Alternatively, the CDD Parties' performance under the Settlement Agreement was excused by Insomniac's material breaches of the Good Faith Provision and the Reasonable Approval Provision").  Counter-Plaintiffs should not be permitted to plead contradictorily to the very Settlement Agreement they attach to their Counterclaim and seek to enforce.  *Griffin Indus., Inc.,* 496 F.3d at 1206 ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."); *see also Associated Builders, Inc.,* 505 F.2d at 100 ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.").

Counter-Plaintiffs overlook the fact that even if there was a material breach (the Counterclaim fails to identify a plausible one), the Parties expressly waived prior breach arguments in the Settlement Agreement through an independent covenants provision and a specific waiver of this claim/defense.  Specifically, the Settlement Agreement states:

> **12. Covenants Independent.** The restrictive covenants in sections 8, 15, and 16 hereof and any such restrictive covenants (confidentiality, non-competition, non-solicitation, nondisparagement) applicable to Space Invaders, LLC are and shall forever be independent covenants such that the breach, by any party, of any provision of this Agreement, or any other agreement by, among, or between the Parties or any combination of the Parties, shall not constitute a defense to, elimination of, or otherwise have an effect on the validity or enforceability of those covenants.

---

[6] Countercl. Ex. B § 12.

**16. Agreement is Legally Binding.** The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs, and estates. Moreover, the persons and entities referred to in paragraph 3 above, but not a Party, are third-party beneficiaries of this Agreement.

**18. New or Different Facts:** No Effect. Except as provided herein, **this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement** or the discovery or existence of any new or additional fact, or any fact different from that which either Party now knows or believes to be true. Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or constitute, a release of any Party's rights to enforce the terms of this Agreement.

*See* Countercl. Ex. B §§ 12, 16, and 18 (emphasis added)

The impact of these provisions is fatal, both to Counter-Plaintiffs' Counterclaim in paragraphs 128-139 and to its Eight Affirmative Defenses, which will be addressed later. It is true that a material breach of a dependent covenant in a contract amounting to a "total breach" such that it frustrates the purpose of the contract, may excuse future performance of the contract by the non-breaching party. Obviously, there are limitations, such as when a party accepts the benefits of that contract, but, in general, that is the law.

However, this doctrine, commonly referred to as the prior breach doctrine, only applies when covenants are dependent and "will be trumped by a contrary intention expressed in an agreement." *Richland Towers, Inc. v. Denton*, 139 So. 3d 318, 321 (Fla. 2d DCA 2014). The court in *Richland Towers, Inc. v. Denton* stated, "[t]he general rule that covenants are considered dependent will be trumped by a contrary intention expressed in an agreement." The contract at issue in that case stated:

*Covenants Independent.* Each restrictive covenant on the part of the Employee set forth in this Agreement shall be construed as a covenant independent of any other covenant or provisions of this Agreement or any other agreement which the Corporation and the Employee may have, fully performed and not executory, and the existence of any claim or cause of action by the Employee against the Corporation, whether predicated upon another covenant or provision of the Agreement or otherwise, shall not constitute a defense to the enforcement by the Corporation of any other covenant.

*Id*. at 321-22. In rejecting the prior breach doctrine and refusing to excuse future performance the Second District Court of Appeal stated, "[a]lthough the circuit court acknowledged the existence of this provision, it disregarded its import." *Id*. "Here, the plain language of the agreements

negotiated by the parties compels our conclusion that the parties unambiguously intended that the covenants were independent." *Id.*

The Settlement Agreement in this case contains an even stronger expression that the Parties agreed that any breach would not excuse performance. Indeed, in Section 12 of the Settlement Agreement, the Parties agreed that covenants were independent, and specifically referenced Section 16, which, in and of itself, confirms that the agreement remains binding. In addition, Section 18 specifically states, "**this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement**." (emphasis added). To disregard this language would be to disregard repeated and confirmed expressions of the Parties in a signed agreement.

The Third District Court of Appeal's opinion in *Reliance Wholesale, Inc. v. Godfrey*, 51 So.3d 561, 565 (Fla. 3d DCA 2010) provides another example. The *Reliance Wholesale, Inc.,* court reversed an order that denied the former employer's motion for a temporary injunction to enforce a non-compete agreement because it had not paid all the commissions due to the former employee. *Id.* The court held that the payment dispute notwithstanding, the former employer was entitled to enforce the non-compete provision because it was an independent covenant according to the plain language of the non-compete clause, which provided:

> The covenants set forth herein shall be construed as agreements independent of any other provision in any other agreement by, between, among, or affecting Reliance Medical Wholesale, Inc. and Employee, and the existence of any claim or cause of action of Employee against Reliance Medical Wholesale, Inc., whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of this Agreement.

*Id.* (emphasis omitted).

The Court "must, whenever possible, construe the agreement according to its plain language and consider the provisions at issue in the context of the entire agreement in order to achieve 'a reasonable construction to accomplish the intent and purpose of the parties.'" *Richland Towers, Inc. v. Denton*, 139 So. 3d 318, 321 (Fla. 2d DCA 2014) (citing *Hand v. Grow Constr., Inc.*, 983 So.2d 684, 686–87 (Fla. 1st DCA 2008).

In the instant Settlement Agreement, repeatedly and quite intentionally, the Parties sought to avoid any such prior breach defense or allegation, including a provision that is nearly identical to the provisions in *Richland Towers, Inc.*, noting that certain covenants are independent and unaffected by a breach. One of those expressly referenced provisions is Section 16, which notes

23

that the Settlement Agreement is binding and enforceable.  And it bears repeating that, Section 18 of the Settlement Agreement specifically states, **"this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement."** (emphasis added).  This language and the independent covenant provision is clear, unambiguous, and cannot be ignored.

Thus, even if, as alleged, Insomniac materially breached the Settlement Agreement to such an extent that it frustrated the primary purpose of the Settlement Agreement, and that such breach occurred prior to the litany of breaches by Counter-Plaintiffs, no future performance was excused. Thus, Count I for breach of contract must be dismissed or, in the alternative, paragraphs 128-139 must be stricken.

## IV. COUNTER-PLAINTIFFS' COUNTERCLAIM MUST BE DISMISSED OR STRICKEN BECAUSE COUNTER-PLAINTIFFS CANNOT FILE A COUNTERCLAIM DIVORCED FROM A PLEADING

Importantly, a counterclaim is not a stand-alone pleading.  Instead, it is part, parcel, and inextricable from an answer and must be filed therewith.  Here, the Counterclaim should be stricken for failure to comply with the Federal Rules of Civil Procedure.

"Ordinarily, a party must assert a counterclaim in its pleadings."  *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1259 n.14 (11th Cir. 2003), aff'd sub nom. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).  There are seven recognized "pleadings," including (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer.  Fed. R. Civ. P. 7(a); *see also Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014) (discussing the types of pleadings under the Federal Rules of Civil Procedure).

"'Because a counterclaim is not itself a pleading, to state a counterclaim consistently with Rule 7(a) and Rule 13, a party must file the counterclaim *as part of* a recognized pleading, i.e. an answer.'" *ITL Int'l, Inc. v. Walton & Post, Inc.*, No. 10-CIV-22096, 2011 WL 13055064, at *1 (S.D. Fla. June 6, 2011) (quoting *Allied Med. Assoc. v. State Farm Mut. Auto. Ins. Co.*, No. 08-CIV-2434, 2009 WL 839063 (E.D. Pa. 2009)) (emphasis original).  The Counterclaim in this case is not part of any pleading, as required by the Rules.  *See, e.g., Blatt v. Goldner*, No. 23-24819-CIV, 2025 WL 2532614, at *23–24 (S.D. Fla. Aug. 20, 2025), report and recommendation adopted, No. 23-CV-24819, 2025 WL 2531830 (S.D. Fla. Sept. 3, 2025)

Courts in the Eleventh Circuit routinely strike standalone counterclaims. *See e.g.*, *Mobley v. Safeco Ins. Co. of Illinois*, No. 12-CIV-70, 2012 WL 12916444, at *1 (M.D. Fla. Apr. 12, 2012) (striking a counterclaim from the docket as the defendant filed a motion to dismiss the complaint, and at the same time, filed a counterclaim); *Optimal Logistics, LLC v. AG Plus Express, LLC*, No. 18-CIV-2224, 2019 WL 13248329, at *2 (M.D. Fla. Oct. 21, 2019) (striking a standalone counterclaim) *Sevi v. Israel Disc. Bank of New York*, No. 13-CIV-21922, 2014 WL 12861831, at *2 (S.D. Fla. July 8, 2014), *report and recommendation adopted*, No. 13-CIV-21922, 2014 WL 12861832 (S.D. Fla. July 28, 2014) (explaining that a stand-alone counterclaim filed before an answer while a motion to dismiss was pending "is simply not permissible"); *Am. Sec. Ins. Co. v. Cazeau*, No. 20-CIV-62607, 2021 WL 6750534, at *2 (S.D. Fla. Apr. 26, 2021) ("Here, Respondent has not answered the Petition, and thus, the Counterclaim is procedurally deficient. Consequently, the Counterclaim is dismissed."); *see also Active Packet, LLC v. Netgen, Inc.*, No. 19-CIV-421, 2020 WL 9073330, at *1 n.1 (M.D. Fla. May 12, 2020) ("The filing of a counterclaim as a stand-alone pleading apart from one's answer is not permitted." "Instead, a defendant's answers, affirmative defenses and any counterclaims must be presented in a single, integrated pleading." (citation omitted)).

While perhaps form over substance, this is a case of significant consequence. There should not be loose ends left untied, which may confuse the docket or worse, form the basis for a procedural appeal.[7]  Counter-Plaintiffs' standalone Counterclaim must be dismissed and, if leave is so permitted, refiled as an Amended Answer Affirmative Defenses, and Amended Counterclaim.

## V.     COUNTER-PLAINTIFFS INCLUDE CONFIDENTIAL MEDIATION COMMUNICATION IN PARAGRAPHS 77, 83, 88, 188, 196, REQUIRING AN ORDER STRIKING THEM AS BEING VIOLATIVE OF THE MEDIATION PRIVILEGE IN SECTION 44.405, FLORIDA STATUTES

Except as expressly provided in section 44.405, Fla. Stat. "all mediation communications shall be confidential.  A mediation participant shall not disclose a mediation communication to a person other than another mediation participant or a participant's counsel."  § 44.405, Fla. Stat. A violation of section 44.405, Florida Statutes, may be remedied as provided by section 44.406. Section 44.406 provides that:

> [a]ny mediation participant who knowingly and willfully discloses a mediation communication in violation of s. 44.405 shall, upon application by any party to a

---

[7]  The filing of the untethered Counterclaim was likely for use in a press campaign designed to further harm Mr. Rotella and Insomniac.

court of competent jurisdiction, be subject to remedies, including: (a) Equitable relief. (b) Compensatory damages. (c) Attorney's fees, mediator's fees, and costs incurred in the mediation proceeding. (d) Reasonable attorney's fees and costs incurred in the application for remedies under this section.

Concerningly, in paragraphs 77, 83, 88, 188, and 196, Counter-Plaintiffs include statements allegedly made during a mediation conducted under section 44.405, Florida Statutes. This cannot be permitted. Though the allegations are disputed, allowing these allegations to remain would be to allow discovery into the intimate details of a confidential mediation, thrust the mediator into this matter as a material witness, and destroy the coveted confidentiality of mediation.

As Judge Raag Singaal succinctly stated:

The Florida Mediation Act (the "Act") states, in part, that "[a] mediation participant shall not disclose a mediation communication to a person other than another mediation participant or a participant's counsel." Fla. Stat. § 44.405(1). The Act further provides for mandatory civil remedies, including equitable relief, compensatory damages, and attorney's fees and costs, against any mediation participant who knowingly and willfully discloses a mediation communication. Fla. Stat. § 44.406(1). **Inclusion of mediation statements in public court filings is a violation of the Act**.

*Drummond v. Zimmerman*, 454 F. Supp. 3d 1207, 1209 (S.D. Fla. 2020) (citing *Leigh v. Avossa*, 2017 WL 3608244, at *2 (S.D. Fla. Aug. 21, 2017) (emphasis added).

Under section 44.405, the only exceptions to this strict confidentiality are the following: First, the confidentiality or privilege against disclosure has been waived by all parties. This is not alleged, nor could it be. Second, the mediation communication is willfully used to plan a crime, commit or attempt to commit a crime, conceal ongoing criminal activity, or threaten violence. This is not alleged, nor could it be. Third, the mediation communication requires a mandatory report pursuant to chapter 39 or chapter 415 solely for the purpose of making the mandatory report to the entity requiring the report. This is not alleged, nor could it be. Fourth, the mediation communication is offered to report, prove, or disprove professional malpractice occurring during the mediation, solely for the purpose of the professional malpractice proceeding. This is not alleged, nor could it be. Fifth, the mediation communication is offered for the limited purpose of establishing or refuting legally recognized grounds for voiding or reforming a settlement agreement reached during a mediation. There is no allegation, request, or motion to void, rescind, or reform the Settlement Agreement here. On the contrary, each count in the Counterclaim seeks

26

damages—with several seeking damages *under the Settlement Agreement.*  A far cry from an action for a recessionary remedy.

Here, there can be no doubt that Counter-Plaintiffs unabashedly violated the Florida Mediation Act.  For example:

> Paragraph 77: "During the mediation, Rotella, through his agents, represented. . ."
>
> Paragraph 83: "consistent with Rotella's and Insomniac's representations during the mediation. . ."
>
> Paragraph 88: "Contrary to Rotella's representations at the mediation. . ."
>
> Paragraph 188: "Rotella stated to the CDD Parties during the June 2, 2025 mediation before Judge Hanzman. . ."
>
> Paragraph 196: "Rotella stated to the CDD Parties during the June 2, 2025 mediation before Judge Hanzman. . ."

These allegations must be stricken and, while counsel for the Plaintiff is cognizant of oft misplaced and overutilized requests for sanctions and is thus reticent to do so, the severity of invading the mediation privilege cannot be overlooked and the appropriate sanction should be considered.

## VI.    THE PERSONAL ATTACKS ON MR. ROTELLA SHOULD BE STRICKEN

As threatened by Counter-Plaintiffs before this litigation, the counterclaim takes aim at Insomniac's CEO, Pasquale Rotella.  However, behind the crosshairs lies not a weapon loaded with claims, causes of action, or even facts, but instead insults, hyperbole, social media posts, and a decades-old misdemeanor conflict of interest charge that was later expunged from Mr. Rotella's record.

Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  A court has broad discretion when considering a motion to strike.  *See Morrison v. Exec. Aircraft Refinishing Inc.*, 434 F.Supp.2d 1314, 1317–18 (S.D. Fla. 2005).  "Immaterial matter" has no important relationship to the claim or defense, and 'impertinent' matter does not relate to the issue in question."  *Badilo v. City of Deerfield Beach*, No. 13-60057-CIV, 2013 WL 3762338, at *1 (S.D. Fla. July 16, 2013) (citing *S.D.* v. St. Johns Cnty. Sch. Dist., 2009 WL 1941482, at * 1 (M.D. Fla. July 7, 2009)).  "The word 'scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual, states anything in repulsive language that detracts from the dignity of the court, or casts a cruelly derogatory light on a party or other person."  *Id.* (citing *S.E. C. v. Lauer*, 2007 WL

1393917, at *2 (S.D. Fla. Apr.30, 2007)).  Consistent with that definition, courts in this District have stricken editorialized or inflammatory material from pleadings. *See, e.g., Blake v. Batmasian*, 318 F.R.D. 698, 701 (S.D. Fla. 2017) (striking plaintiffs' footnote that argued defendants' litigation position as "inappropriate" for a complaint); *S.E.C.,* 2007 WL 1393917, at *2 (striking scandalous accusations as improper).

Counter-Plaintiffs devote an entire section to Mr. Rotella's supposed "history of criminal and civil misconduct," recounting a 2012 indictment, a 2016 misdemeanor no-contest plea, a civil lawsuit by the Los Angeles Memorial Coliseum Commission, and a list of social-media insults from nameless non-parties (or potentially bots) who have no connection to this matter.  Countercl. ¶¶39–52.  They assert, among other things, that "Rotella is not just a criminal and a fraud. He is also insufferable to work with," and that he and Insomniac are "infamous…for their predatory tactics and greed," backed by hyperlinks to TikTok/Instagram posts and comment threads.  None of this has any tendency to prove (or disprove) the discrete disputes pled here—i.e., whether Insomniac breached any duties to collaborate in good faith on Hocus Pocus and Art Basel under the Settlement Agreement and whether any later statements (during mediation) induced reliance. *See* Countercl. ¶¶15–19, 78–85.  Instead, these passages are classic "scandalous" matter aimed at painting Mr. Rotella as a bad actor based on unrelated, remote events and social-media rhetoric. That is precisely the sort of character-propensity content Rule 12(f) allows courts to purge from pleadings. *See Badilo*, 2013 WL 3762338, at *1–2; *Lauer*, 2007 WL 1393917, at *2.

Courts in this District have not hesitated to strike allegations about prior criminal history and similar "bad character" material when it bears no nexus to the claims. In *United States v. Med-Care Diabetic & Medical Supplies, Inc.*, No. 10-81634, 2014 WL 12279511, at *1–2 (S.D. Fla. June 17, 2014), Judge Ryskamp struck exhibits and factual allegations about a defendant's prior felony convictions as improper propensity and unduly prejudicial at the pleading stage.  The same reasoning applies here: Counter-Plaintiffs' references to a years-old indictment/plea and unrelated civil allegations (Countercl. ¶¶40–47) have no bearing on whether Insomniac later complied with a 2025 agreement to collaborate on two Miami events.

Therefore, the Court should strike: (i) ¶¶39–52 in their entirety; and (ii) the embedded social-media content and links referenced at ¶¶51–52 & n.4 and earlier n.3.  At a minimum, the Court should order Counter-Plaintiffs to replead without inflammatory character accusations or third-party opinion compilations.

## CONCLUSION

WHEREFORE, Plaintiff, Insomniac Holdings, LLC, and Counterclaim Defendant, Pasquale Rotella, hereby pray for an order dismissing and/or striking the Counterclaim, striking paragraphs 39–52, 77, 83, 88, 188, 196, awarding attorneys' fees and litigation costs pursuant to sections 16 (Mr. Rotella is a third party beneficiary) and 22 of the Settlement Agreement, and for such other and further relief as this Court deems just and proper.

Dated: October 14, 2025,             Respectfully submitted,

SHAW LEWENZ

By:    /s/Jordan A. Shaw_____
Jordan A. Shaw, Esq.
Florida Bar No.: 111771
Zachary D. Ludens, Esq.
Florida Bar. No.: 111620
Gabriel E. Morales, Esq.
Florida Bar. No.: 1038778
Lauren N. Palen, Esq.
Florida Bar. No.: 1038877
110 SE 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Telephone: (954) 361-3633
Facsimile: (954) 989-7781
Primary: jshaw@shawlewenz.com;
zludens@shawlewenz.com;
gmorales@shawlewenz.com;
lpalen@shawlewenz.com
Secondary:    avazquez@shawlewenz.com;
lgrealy@shawlewenz.com
*Attorneys for Counter-Defendants Insomniac Holdings, LLC and Pasquale Rotella*

## CERTIFICATE OF CONFERRAL

I HEREBY CERTIFY that on I conferred with counsel for Counter-Plaintiffs about Insomniac's request to strike allegations 39–52, 77, 83, 88, 188, and 196 of the Counterclaim, and regarding their failure to include the Counterclaim as part of a pleading, and Counter-Plaintiffs object to the relief sought.

/s/ Jordan A. Shaw
Jordan A. Shaw, Esq.

29

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing document was filed with the Court's CM/ECF system this October 14, 2025, and was served on all counsel of record via notices generated by the same.

*/s/ Jordan A. Shaw*
Jordan A. Shaw, Esq.
